The Chancellor.
This cause is presented on a writ of error from the supreme court, upon a judgment, rendered therein, in affirmance of a judgment of the mayor’s court of the city of Albany, on a special verdict there taken. The special verdict is spread on the record brought up, and the cases of the parties, which are in the hands of every member of the court, containing every part thereof, material to the points to be decided on, renders it unnecessary to read it. It is distinguished from the case last adjudged, by coming up on an action of the assignee of a sheriff, on a bond given to him for the liberties of the gaol. The case adjudged, it will be recollected, was for an escape against a sheriff.
The errors which have been insisted on,’ are:
1. That the bond being merely a bond of indemnity, the immediate and voluntary return of the prisoner, without any suit having been brought against the sheriff, and the prisoner remaining thereafter in execution, iñ the limits, are an absolute bar against the sheriff for the alleged escape, and therefore take away all right of action upon the bond by the sheriff, and, consequently, by the assignee.
2. Because the measure of damages adopted by the jury is an erroneous one.
The defendant’s third plea is, that John W. Barry, (the prisoner,) “ accidentally and inadvertently, and without intention to escape, stepped beyond the outer line of the liberties of the said gaol, &c. and did, afterwards, to wit, before the commencement of any suit against the sheriff of the said city and county, for the cause aforesaid, and before the assignment of the said writing obligatory so taken for the liberties aforesaid to the said plaintiff, voluntarily return within the liberties aforesaid, and hath ever since remained, and still remains, a true and faithful prisoner, within the-liberties aforesaid, for the cause aforesaid.”
*581 The jury, by this verdict, have found specially, that on the 12th day of August, 1811, the said John W. Barry did go without the limits of the liberties of the said gaol, to wit, into the enclosure of one Henry Vrooman, detailing the precise manner in which he had several times in one day, inadvertently, but voluntarily, gone a few yards beyond the liberties, in driving a cow, but immediately returned, &c.
This action was brought for an escape, alleged to have happened after the passing of the act of 1809, on the subject of gaol liberties. To the sixth section of the act of 1801, which imposes the duty of admitting prisoners to the liberties, there is a proviso, that nothing in the said act contained shall be construed to exonerate the sheriff, in case any prisoner shall escape from the limits ; and the bond, in the enacting part of that section, is declared to be for the indemnity of the sheriff only.
This statute left the sheriff exposed to suits, as he was under the English code. It provided that an escape from the liberties should not exonerate him, and if the intent was to deprive him of his right of pursuit and recaption, it left him defenceless against all the casualties from inadequate securities, in which an error in judgment might involve him, for he was required to judge at his peril. If the bond he took was to receive the restricted construction contended for, an actual damnification, not a prospective or eventual one, must be the ground of his action, and the measure of his damages; and so, it would seem, was the clear intent of the provision; for, though it might cover the charges attending the pursuit and recaption of the prisoner, no suit could be maintained for the damnification arising from his being compelled to satisfy the plaintiff, until he had been subjected to a recovery, indefinite as to the time in which it might have been had, within the usual legal limitation, which has, however, now, by the statute of 5th April, 1810,* been limited to one year; and if the sheriff had totally lost his right of recaption on fresh pursuit, the former branch of these damages could give him no right of action. A different construction would have entitled the sheriff ío a recovery of either more or less of the amount of the debt; and if he should prove insolvent, or the plaintiff, on the execution, should, for some other reason, prefer the pursuit of the person or property of the prisoner, the recovery, in its effect, would have a source of profit, instead of mere indemnity, to the sheriff.
*582 The statute of 1809 was intended to remedy the incongruity of this state of things. That statute graduated the measure of da* maSes > provided for the assignment of the bond; for staying a suit against a sheriff; for an escape, after judgment; for a reasonable time to enable him to collect the amount on the bond; an(j provided that upon a recovery by the sheriff, if the consideration of the bond had been broken, he should recover the amount due in the original action only, for which such execution issued; that upon a recovery by an assignee he should recover the amount due as aforesaid, with all such fees as should have accrued thereon.
The condition is undoubtedly broken when a prisoner, voluntarily and advisedly, goes beyond the liberties. An involuntary, momentary excursion, occasioned by an unreflecting impulse of the mind, as in the performance of an act of humanity in rescuing a person from impending destruction, the extinction of fire in the verge of the liberties, unperceired by others, an irresistible pres» -sure occasioned by a popular commotion, or wanton violence, instances suggested by way of illustration might, in my opinion, unhesitatingly be pronounced not an intent to escape, if followed by a prompt and immediate return.
If the sheriff’s right of retaking on fresh pursuit is unimpaired, he has his election to avail himself of it, or resort to his bond. If he pursues, retakes, and recommits, it is a waiver of his recovery, beyond the expense he has been put to in reclaiming the prisoner; if the prisoner voluntarily returns, he is in statu quo; but in either case the plaintiff on the execution, might, by bringing a suit against the sheriff, before the recaption or voluntary return of the . defendant, fix him.
Let us now- test the present case by this rule. Suppose the sheriff had brought his action on the bond, and the defendant had pleaded a voluntary return, and that the sheriff had affirmed him his prisoner by locking him up in gaol, and that he was not otherwise damnified, would not this have been a complete bar? If this was a valid plea against a sheriff, in an action on the bond, it cannot be less valid against an assignee, who cannot succeed to more enlarged rights than the sheriff had.
The plea which has been affirmed by the verdict of the jury is precisely this case. ■ All the requisite inducements have been found by the verdict; that the defendant in the original suit was admitted to the liberties, on bond; that he thence escaped with *583 euf the privity or knowledge of the sheriff; that he afterwards returned, and then, and always since, has remained in execution for the cause aforesaid.
If this is verified, whence can the plaintiff deduce his right to a recovery ? He had a right, independent of the sheriff, and against him; but the sheriff might, according to my reasoning in the last case adjudged, plead fresh pursuit and recaption, which was an effectual bar. If he elected to take an assignment, he acquired the right the sheriff had, at the time of the assignment, and nothing beyond it. The sheriff might formally have released the obligors; he might have modified his rights by contract, or by his acts before assignment, and his' assignee must have been bound.
The right of recaption was personal in the sheriff; if he asserted it, as between him and the prisoner, their former relation of keeper and prisoner was restored. Whether the sheriff could or could not reimburse himself by a suit on the bond, for the damages he had sustained by the escape, could not affect the interest of the plaintiff on the execution, but the recaption might; for if that took place before suit brought by him against the sheriff, it was a bar to his action. Here the plea alleges "that he has asserted his right of recaption before suit brought, and this bars both the sheriff and his assignee.
From this train of reasoning I am satisfied that the judgment of the supreme court is erroneous, and that it ought to be reversed.
Lewis, Senator, was also of opinion that the judgment of the supreme court ought to be reversed, and gave his reasons, at length; but the reportar, not being present, is unable to state them.
Platt, Wilkins, and Wendell, Senators, not having heard the argument, gave no opinion.
Van Buhen, Senator. The jury, by their special verdict, found, that on the 12 th of August, 1811, Barry “ did go without the limits, to wit, into the enclosure of one Henry Vrooman, which was formerly included within the liberties of the gaol; but by a subsequent survey, (made, however, before the execution of the bond, on which the suit was brought,) one part of the said enclosure, which bad been separated by a fence, was excluded from the. *584 liberties; that the fence had been removed, and no marks were visible where it had stood, except a small ridge of ground; bat there was a mark on the house of Vrooman, and another on the fence opposite, which designated the line of the limits; that Barry stepped six or eight feet or more, and went round a cow, to drive her at the extreme end of the yard, over the outer lines of the said liberties, at the place aforesaid, and remained there three or four, or ten minutes, and returned within the limits; that about that time, he remarked that he must be careful where he went, and that he did not go over the limits.” They also found another escape, substantially similar to the one above stated, and “ that no suits had been commenced against "the sheriff, for the said escapes; that this suit was commenced on the 15th of November, 1811, and that the boiid was assigned to the plaintiff below on the 11th of the same month.”
Upon these facts the mayor’s court gave judgment for the plaintiff below, which judgment, having been affirmed by the supreme court, is alleged to be erroneous by the plaintiff in error; and is sought to be corrected in this court of dernier resort. Although the amount in controversy is' trifling, the case involves a principle of the first importance, and which merits the highest attention of this tribunal.
The plaintiff in error alleges two principal reasons why the judgment below should be reversed; but as from the view which I have taken of the subject, it will only be necessary to consider the first, I shall confine myself to that exclusively, which is, that “ the bond to the sheriff is merely a bond of indemnity / that the immediate and voluntary return of the prisoner, without any suit having been brought against the sheriff and the prisoner’s remaining thereafter in execution, within the gaol limits, are an absolute bar to any action against the sheriff for the alleged escape; and, therefore, take away all right of action upon the bond, by the sheriff, and, consequently, by his assignee.”
If the position taken by the plaintiff in error be correct, in point of law, it cannot be denied but that the facts in the case will support them, and the judgment given below must be held erroneous. To show that it is not so, the defendant in error relies on a decision of the supreme court, made in February term, 1809, in the case of Tillman v. Lansing, which was reviewed and supported by the same court, in February term, 1811, in the case of Dash v. Van Kleeck; and if the decision of that court, in the first case *585 referred to, was a correct exposition and declaration of the law of the land, the plaintiff below, in this cause, would be entitled to recover, and, consequently, the judgment of this court should be that of affirmance.
That the eminent talents and distinguished integrity of the members who constitute the supreme court, justly entitle their decisions to the highest respect and consideration, is universally admitted; that they have been so received and considered by this court, its past conduct has testified; that the justices of that court, however, in common with the rest of mankind, would be subject to error; and that, in the variety and multiplicity of their concerns, they would sometimes unavoidably mistake the law, was, at the foundation of our government, foreseen. To correct such errors the constitution has provided this tribunal: whether that was wisely or unwisely done, it is now too late to inquire. By that provision it becomes our official duty to pass on their decisions, and, aided by the best lights that are afforded to us, and an exertion of such abilities as we may possess, to affirm or reverse them, as we shall find them, in our best judgment, right or wrong.
In matters of mere private opinion, no one would be more ready to surrender his individual impressions to those of the justices of the supreme court than myself; but situated as I am, and believing as I do that their decision in the case of Tillman v. Lansing was improvidently and erroneously made; and that the force of a previously expressed opinion, on the same point, in a great measure led to the reiteration of it, in the case of Dash v. Van Kleeck, I cannot but consider it as a violation of constitutional duty to omit doing as much as in me lies to obtain its correction.
By the act of the 30th of March, 1807, which was but a reenactment of a then existing law, on a revision of our code of laws, it is made the duty of the sheriffs to permit all prisoners who were, or might, come into their custody, on civil process, to go at large, within the limits appointed to their respective gaols, on their giving the security required by that statute, securing, by its provisions, the sheriff against suits for escapes, for suffering them to go at large within the limits, but rendering them equally liable for an escape from the limits, as they before were for an escape from the four walls of the prison»
*586 The rights and liabilities of sheriffs, before the allowance of the limits, were not, -nor could they be, a matter of litigation; the law in this respect, upon that subject, has been too well settled to render it necessary to cite authorities; the decisions which had long since been acquiesced in, in England, which had again and again been recognised in our courts, and which are expressly admitted by the supreme court, in the case of Tillman v. Lansing, were, that for an involuntary escape from the walls of the prison, recaption on fresh pursuit, or a voluntary return of the prisoner to ihe prison, before suit brought, was a complete defence to the shci iff.
Lest the terms voluntary and involuntary escape might tend to confuse the question, it may be well.here to state, that in using the terms as applicable to this suit, they are, and can only be, used as relating to the conduct of the sheriff. Although it was in some de-' gree urged by the counsel for the plaintiffs in error, that the escape, as it appears from the special verdict, might well be considered as involuntary on th,e part of the prisoner', I am not prepared, nor is it necessary, to decide that they could derive a valid defence from that source. For a voluntary escape on the part of the sheriff, he can have no defence. How far recaption, or a voluntary return before suit brought, furnishes him with a defence for an escape, as to him involuntary, that is, without his express permission or connivance, is the question under discussion.
From the period of the first act relative to the gaol liberties to the revision of the laws in 1801, and from the passage of the act of the 30th of March, in that year, until the decision of the case of Tillman v. Lansing, in 1809, the common law rights of the shes ;ff, of recaption and, voluntary return, were .universally cons.-< e; ed as having been left unimpaired by the different statutes which have been passed upon the subject. Nor was this the impression of the multitude, who might properly be deemed incompetent to judge upon the Subject, but of the soundest and best lawyers of the state, the correctness of which, if not expressly agre ui to, was certainly tacitly acquiesced in by the major part, if not the whole, of the respectable gentlemen who, in 1809, filled the bench of the supreme court.
So was the law considered to be until the attention of the profession was arrested by the decision of the supreme court, in the case of Tillman'v. Lansing, which, in substance, was, that a voluntary departure from the limits, for ever so short a period, *587 multi not be purged, by any act to be done by the sheriff or the prisoner, and that the sheriff was, ipso facto, liable to the plaintiff for the debt for which the prisoner was confined; that the sheriff was, by force of the statute of March, 1801, devested of his com• mon law rights, which, it was admitted, he before had.
To support this construction, the supreme court resort, first, to the express provisions of that statute; and what cannot be drawn from that source they seek to make up, by bringing their decision within the policy and purview of the act; in both which points of view I shall consider it
As this is the starting point of difference, between their opinion and the one I hold, it is of moment that it be fully explained. The error, which it becomes my duty; with becoming diffidence, to show has been indulged in, originates here. Before the statutes, they admit that a sheriff’s common law rights existed, as they are now claimed; by the statutes it is, they allege, that those rights have been taken away.
In the construction of all statutes, courts are, and ought to be, guided by the rules of construction furnished by the common law, some of which have been so long acquiesced in as to become maxims, the most prominent of which, on the subject of statutes altering the common law, is that adopted by Chief Justice Trevor, in the case of Arthur v. Bohenham, in the reign of Q,ueen Anne, reported in 11 Mod. 149. which has been repeated in the most celebrated digests of the laws of England, and supported by previous and subsequent adjudications, viz. That “ the general rule in the exposition of all acts of parliament is, that in all doubtful matters, and where the expression is in general terms, they are to receive such a construction as may be agreeable to the common law, in cases of that nature; for statutes are not presumed to make any alteration in the common law, further, or otherwise, than the statute does expressly declare: therefore, in all general matters, the law does not presume the act did intend to make any alteration; for if the parliament had had that design, they would have expressed it in the act.”
Testing the act of 1801 by these rules, we shall search in ' vain for any declaration or provision which authorizes the construction, that a sheriff’s common law rights of recaption and voluntary return had been taken away, or affected by it; there is not only no expression to that effect, but, as it respects the power of a sheriff over the prisoner, after leaving the limits. *588 which is the place where the difficulty arises, (the provision, authorizing him to confine him, while on the limits, on failure of his security, being perfectly indifferent, as it respects the question,) the act is utterly silent; and, as it respects the liability of the sheriff for that departure, it expressly leaves him in the same situation in which he stood at common law, as for an escape from the walls of the prison; it cannot, therefore, with propriety be contended, that a sheriff’s rights are taken away by the letter of the statute.
Failing to find a justification of the construction adopted, by them in' the letter of the statute, the supreme court, of necessity, resort to its spirit; to what is termed by judges the construction of a statute by its equity; that Cases which are within the reason of the statute, although not touched by the letter, shall, by the aid of judicial construction, be held to be within its letter. But, in thus seeking to support the doctrine contended for, we are met by another inveterate maxim of the common law, viz. “ That an obscure statute ought to be construed according to the rules of the common law.” (Bac. Abr. 384.) And this construction, set up to defeat a common law right, is also in violation of another salutary rule of that law, “ that an act which is to take away or clog a remedy, which the party has by the common law, ought never to have an equitable construction.” (6 Bac. Abr. 388.)
But, admitting for a moment that it was competent to the court below to take away, by the aid of construction, this common law-right, which is not affected by the letter of the statute, what are the reasons which are assigned in its favour ? They are, that unless this construction is put upon the statute, imprisoned debtors would take advantage of Sundays, and of the absence of their creditors, to snatch a few moments of liberty, which, although soured by constant perturbation and alarm, are, notwithstanding, deemed fit subjects for judicial animadversion; and that the allowance of a sheriff’s common law rights is against the policy of a statute, which, in the language of the chief justice, “ was passed} for humane purposes.”
If these stolen pleasures are public abuses; or, if they can be supposed to work private injuries, (not admitting that they are so, or thinking it material to discuss whether they are or are not,) it is, in my judgment, a satisfactory answer, to all arguments to be drawn from that source, that these are matters of legislative concern ; that if they were of more consequence, they could not, *589 riad as they are, clearly would not, satisfy us in disregarding the established rules for the construction of statutes, for the purpose of preventing them.
Permit me next, respectfully, to examine with what propriety it can be alleged, that escapes of this description are so far against the policy of the statute, as to render the construction of the court below proper and necessary. As it has truly been remarked, “ this statute was passed for humane purposes ;33 it was among the first concessions which were made by that inflexible spirit, which has hitherto maintained its hold on society, authorizing imprisonment for debt. Coeval with the authority of imprisonment for debt have been the exertions of men of intelligence, of reflection, and .philanthropy, to mitigate its rigour; of men who viewed it as a practice fundamentally wrong, a practice, which forces their fellow-creatures from society, from their friends and their agonized families, into the dreary walls of a prison; which compels them to leave all those fascinating endearments, to become an inmate with vermin; which confines them within the same walls that contain the midnight incendiary and the ruthless assassin ; not for crimes which they have committed; not for frauds which they have practised on the credulous and unwary; (fos such distinctions are not made;) but for the misfortune of being poor; of being unable to satisfy the all-digesting stomach of some ravenous creditor; of men who looked upon the practice as confounding virtue and vice, and destroying the distinction between guilt and innocence, which should unceasingly be cherished in every well regulated government.
Although not completely successful, they have in part succeeded, and the act under discussion was intended as an amelioration of the rigour of imprisonment for debt. How, then, I ask, ought such an act to be construed? Rigorously, or liberally t What is its policy ? It is, say the supreme court, humanity. How, then, should it be construed ? Why, liberally and humanely. What was the old law, the mischief and the remedy? By the old law, a person imprisoned for debt was confined to the damp walls of the prison : that imprisonment was the mischief intended to be remedied by the statute ; and the remedy to be afforded was an enlargement of the prisoner, and confining him to the liberties instead of the walls of the prison. It is our duty to construe the act so as to remove the mischief and promote the remedy; and, in my humble *590 opinion, the construction I contend against would not effect either.
The act professes to give a portion of liberty to the unfortunate debtor; but by the construction set up, the legislature are made to exact a price for it which very few, indeed, could pay. These objects of legislative favour are generally poor; and, consequently, too often friendless. The exacted rigour of the confinement to the limits is such as requires the utmost prudence and temperance to comply with. It compels the prisoner not only to be proof against surprise, but to subdue every feeling of humanity ; a rigour which maintains its force, whether the prisoner is forced from the limits, to save the life of a fellow creature, which he sees in imminent danger, or to extinguish the flámes which threaten to consume the property, and endanger the lives, of hi», fellow citizens; which admits of no excuse but the ignorance of that which the prisoner, above every other thing, ought to know, viz. the extent of the limits.
Should this rule ever become the established law of the land, how many will be able to get bail ? What prudent man will become bail? If such can be supposed to have been the intention of the legislature, every man’s observation must satisfy him, that the number who could partake of this legislative favour would be few indeed.
Again, imprisonment for debt must originally have been intended to force the able but perverse debtor to pay his debt; but, under the doctrine contended for, imprisonment carries no terrors to him; he gives his bond, derides the sheriff, who, it is said, has no right to stop him, laughs at his creditor, postpones his payment, and reassumes his liberty.
Lastly, it is oppressive upon the sheriff By the statute, he is obliged to take the security: true it is, he may examine and decide on its sufficiency, but he may err; and there is no subject more uncertain and deceptive than the solvency of men in business. True it is, that if he errs, and the prisoner is fool enough to remain on the limits until the sheriff discovers his mistake, or the imposition which has been practised upon him, he may reimprison; but if he steps over the limits, according to the decision of the supreme court, he is out of the sheriff’s power, who is driven to his bond alone for his security.
But why this additional responsibility of the sheriff? Why deprive him of the right of recaption? By the statute, the legis* *591 Sature have deprived him of the security of his lock and key > they have placed him in a situation to be injured; they have provided that he shall be responsible for an escape from the limits, to the same extent that he was from the prison; why, then, deprive him of the same rights which he had under his previous liability ? In the case of Dole v. Memtton and others, (2 Johns. Cas. 206») his honour the chancellor (then Chief Justice) says, that when the security is offered, the four walls of the prison, according to the ancient law, are enlarged to the extent of the limits assigned by the statute; and the law concerning escapes must, without doubt, apply to the limits in the same manner as it formerly appliéd to the four walls of the prison. So that the limits are to be considered, in such case, as the prison.” Before the statute, the sheriff had his prison doors for his security; these the legislature have opened. Instead of them, he can now only have his bond; his liability has not been diminished ; facility has been afforded to ensnare him, and, 1 ask, what earthly reason can be given why his common law rights of recaption, and voluntary return before suit brought, should be taken from him ?
Thus far I have considered the law, as it stood at the time of the decision in the case of Tillman v. Lansing; and it is this view of the subject which compels me, without doing violence to my judgment and conscience, to hold that decision erroneous.
But it is contended that if the sheriff was not, before the act of the 5th of April, 1810, liable to the creditor, (since which it is not pretended that, he is,) that still, in virtue of the assignment of the bond, and the act of the 28th of March, 1809, the debt can be recovered from the principal and his sure!}'-»
The bond in this case v/as forfeited, if forfeited at all, in the hands of the sheriff; he became subject to no possible loss or damage in consequence of the alleged forfeiture; still, it is contended, that, exempt from injury himself, he could, either in his own name or by assignment of the bond to the creditor, recover the amount of the debt for which the prisoner was committed.
This doctrine is not only opposed to the general rule of law, relating to assignments, and which is not lightly to be shaken, that the assignee can have no greater or other rights than the assign- or ; it is not only in direct hostility to the principle, that the holder of a forfeited bond cannot, by his own act, and Without further connexion with the debtor, confer rights on his assignee which he had not himself; but it is contrary to the declared opi *592 nion of the supreme court, in the case of Dash v. Van Kleeck, ia which the Chief Justice expressly says, “ that if the sheriff was not responsible to the creditor, the prisoner was not responsible to the sheriff.”
It is, however, contended that the common law rights and interests of the parties have been changed from what they would otherwise be, by the operation of the act of the 28th of March, 1809; that, by the first section of that act, it is provided, that in case a suit is brought by the assignee, he shall, upon obtaining judgment, recover the amount due in the original action, &c. and that the third section enacts, that if a suit is brought by the sheriff on the bond, and the condition thereof be broken, his measure of damages shall be the same as those of the assignee. To this construction of the last-mentioned act I must ever dissent, and the grounds of that dissent are,
1. That the statute does not admit of this construction.
2. That if it does, the act of the 5th of April, 1810, operated as a virtual repeal of the- provisions which justified that construction.
1. That these are bonds of indemnity only, has been declared by a declaratory act, passed on the 30th of March, 1799, re-enacted by the revised law of 1801, expressly decided to be so by the supreme court, in the case of Dole v. Moulton and others, and not denied in the case of Tillman v. Lansing,* and so, from the very nature of the instrument, it must be. The prisoner owes the sheriff personally, no duty; in his imprisonment, the sheriff has no direct interest; he only stands between him and the creditor; the escape is injurious to the creditor only; his remedy is against the sheriff, and when the sheriff is damnified by the enforcement of that remedy, then, and then only, can he look to his bond for his indemnity. Until he is damnified, the bond is not broken, which is declared to be for his indemnity only. The object which the legislature must have had in view, by so tenaciously declaring' that the bond should be for the sheriff’s indemnity only, must have been, and its legal effect is, to distinguish it from other bonds, which are to do and perform directly to the party to whom they are given, and for a breach of the condition of which, although unaccompanied with actual damage, the law implies legal or nominal damages, and the party may be put to costs and vexation. Not so with regard to the bond of indemnity. The obligor may say, “ true it is, I have broke the terms of the bond, which in other *593 fiases might entitle you to maintain your suit, but in this case something more is necessary than the breach of the bond; you must show that you are actually injured by that breach, and when I show that you are not, my plea of non damnijicatus is supported, and my defence complete.”
Testing those bonds by these rules, which I hold to be correct, it will at once be perceived, that the act of the 28th of March, • 1809, does not support the ground assumed by the defendant in error; that act provides that the assignee shall, upon obtaining judgment on the bond, and the sheriff shall, if the condition of the bond be broken, recover the full amount, &c. But as to what shall or shall not entitle the assignee to judgment, or enable the sheriff to show a breach of the bond, the act leaves the matter precisely where it stood before. So far from being, as it is alleged, in affirmance of the decision of the supreme court, in the case of Tillman t. Lansing, it uses the choicest words to preclude that inference.
If, then, I am correct, that recaption, or voluntary return before suit brought, was a defence to the sheriff, it was also to the prisoner and his bail, and the assignee could not have judgment, or the sheriff show a breach, to enable them severally, under that act, to arrive at the question of their damages.
2. Should the statute of March, 1808, be susceptible of the construction sought to be put upon it, it has been abrogated. It was passed in March, and the decision of Tillman v. Lansing was made in February, in the same year. If the legislature meant to provide the remedy it is said they did, it must have been bottomed on the sheriff’s supposed liability to the creditor. In April, 1810, they passed a law securing to the sheriff his common law rights. That law was passed long before the escape in this cause, and yet it is contended, notwithstanding the sheriff was not liable to the creditor, that the prisoner, by the act of 1809, is liable to the sheriff or his assignee. Although the statute provides that the sheriff may assign, it does not say that he shall assign the bond, and it is in vain to pretend, that if the construction put on the act of 1809 is correct, there is any other way to prevent the sheriff from bringing a suit in his own name, and pocketing the money, than to consider the act of 1810 as a virtual repeal of that of 1809, so far as it tends to give the sheriff or his assignees rights which are. not founded on his liability to the creditor. To say that the sheriff shall be indemnified; and still have a right of action, for an aeA *594 which works no possible prejudice to him, would indeed be “ moa» strous.”
The construction of statutes always has been, and should be, com-trolled by the rules of the common law. Among those rules, there is none more fully recognised than the one that “ when the reason of the law ceases, the law also ceases.” The reason of the statute of 1809 must have been the alleged responsibility of the sheriff; the statute, therefore, which removed that reason, by exonerating the sheriff from responsibility, should be construed to abrogate the. provisions of the previous act, and this rule of construction is supported by innumerable authorities: as, “ Every affirmative statute is a repeal, by implication, of precedent affirmative statutes, as far as it is contrary thereto, for leges posteriores, priores contrarias abrogante’ (4 Inst. 48.) Again, “if a former act says a juror shall have twenty pounds a year, and a new statute after-wards enacts that he shall have twenty marks, here the latter statute, though it does not expressly, yet it necessarily implies a negative, and virtually repeals the former; for if twenty marks be made a qualification sufficient, the former statute, which requires twenty-pounds, is at an end.” (1 Bl. Com. 89.)
To support the decision of Tillman v. Lansing, it is contended that the act of 1809 was in affirmance of it; if so, the additional rights it gives the sheriff were in consequence of the liabilities imposed upon him by that decision. When, then, the legislature, by the act of 1810, destroyed that supposed liability, such of the provisions of the act of 1809, as went to secure him against them, were at an end, were virtually repealed.
In every point of view, therefore, in which I have been able to consider this cause, I am necessarily and imperiously led to the conclusion, for the reasons I have stated, that the judgment of the supreme court, in this case, ought to be reversed.
All the other senators present, except one, concurring in the opinion that the judgment of the supreme court ought to be reversed, it was thereupon ordered and adjudged that the judgment given in the court of common pleas, or mayor’s court of the.city of Albany, and the judgment-given in the supreme court affirming the same, be reversed that the said Ephraim Mandell take nothing by his plaint, and that he be in mercy, &c. and further, that the *595 Maid Ephraim. Mandell pay to the said John W. Barry and Somvel Barbéele their costs by them about their defence in the said mayor’s court, &c. and that the record, &c, be remitted. Sec»
*594 lurch SI,
*595 Judgment of reversal.(a)

 Laws of 1810, Fol. 86.

 See ante, Jansen v. Hilton, p. 549.

 5 Johns Rep. 42.