STEEN & CIVERGIUS FACTORY, ETC. (UNITED STATES v.). See Case No. 16,-383.

STEERE (ASHBY v.). See Case No. 576.

## Case No. 13,350.

### STEERE v. FIELD.

[2 Mason, 486.] [1]

Circuit Court, D. Rhode Island. June Term, 1822.

ESCAPE—LIBERTY WITHIN WALLS—MAKING TURN-KEY—RHODE ISLAND PRACTICE.

1. At common law it is not an escape in a gaoler to allow prisoners confined for debt the

---

[1] [Reported by William P. Mason, Esq.]

liberty of all the apartments within the gaol walls, for confinement within the walls is salva et arcta custodia.

[Cited in U. S. v. Knight, Case No. 15,539.]

2. Quere. Whether it be an escape to allow such prisoners the liberty of the prison limits?

3. But it is an escape in the gaoler to make a prisoner for debt a turnkey, and to entrust him with the keys of the outer doors, as well as inner doors, at all times by night and by day.

4. If the gaoler be committed to his own gaol, on execution by the sheriff, and no new keeper is appointed, it is an escape of the gaoler, for which the sheriff is accountable; but it is not an escape of the other prisoners, if they are in fact kept in custody under the gaoler's authority or his agents.

[Cited in Skinner v. White, 9 N. H. 213.]

5. In Rhode Island, the doctrine as to escapes is that of the common law, and the statutes giving the liberty of the limits to prisoners, on giving bonds not to escape, &c., have not altered the common law.

[Cited in Gwinn v. Hubbard, 3 Blackf. 15.]

6. In Rhode Island, an action of debt for an escape is a legal remedy, that action being incorporated into their laws by implication, from their adoption of the English laws.

Debt against the defendant, the late sheriff of Providence county, in the state of Rhode Island, for an asserted escape of one Joseph Witmarth, who was committed to the gaol of that county, upon an execution in favor of the plaintiff, while the defendant was sheriff, and of course while he had the care and custody of that gaol in virtue of his office. The cause was tried at the last November term, on the general issue, nil debet, and a verdict was then found for the plaintiff, subject to two questions of law: (1) Whether an action of debt was a proper remedy in this case. (2) Whether upon the facts there was in point of law an escape of the prisoner.

The judgment and execution in favor of the plaintiff against the prisoner, and his commitment to the gaol in execution, were admitted at the trial. It was also in evidence, that at the time of the commitment, Stephen Witmarth, the brother of the prisoner, was keeper of the gaol under the defendant. The gaol consists of a single building, three stories high. On the lower floor the gaoler occupied for himself all the rooms for family purposes. A part of the second story was used for prisoners confined for debt, who had the liberty of the yard; and the remaining part of the second, and the whole of the third story, were used for prisoners, who were in close confinement. The only avenue to the prisoner's rooms in the upper story was through the kitchen on the lower floor. There were no walls round the gaol, and the liberties or limits had no visible lines or fences to mark them. During the imprisonment of Joseph Witmarth, he never gave any bonds for the prison liberties, and was never locked up in any room by day or by night. He was allowed to go at his own pleasure into all the apartments in the house, was entrusted with the keys of the outer and inner doors of the gaol, as well when the gaoler was abroad,

as at home, and acted generally as a turnkey and assistant of the gaoler, receiving, discharging, and locking up prisoners, and performing other official duties for him. His control over the keys of the gaol was never limited to any particular times or occasions. During the day time, the outer doors of the gaol were usually left unlocked. There was no evidence that Joseph Witmarth ever went out of the gaol house after his commitment. But his brother, the gaoler, while Joseph was in imprisonment on this execution, was himself committed to the same gaol, and remained there a prisoner for some days. During this period, Joseph Witmarth had the gaol keys as usual, and the defendant (the sheriff) did not appoint any other keeper of the gaol, and did not visit the gaol oftener than had been usual with him at other periods.

There was no proof of any appropriation of any particular part of the gaol to the gaoler, or to the prisoners, under legislative or any other public authority. The appropriation, such as it was, was made by the gaoler or the sheriff at his own pleasure, and with reference to his own accommodation.

Such were the material facts, upon which, at the trial, a verdict was directed to be taken for the plaintiff, with a view to the more solemn consideration of the cause, upon an argument at bar.

Mr. Searle, for plaintiff, contended, on the first point, that debt was the proper form of action, and cited 1 Chit. Pl. 81; Bullard v. Bell [Case No. 2,121]; [Raborg v. Peyton] 2 Wheat. [15 U. S.] 386. He admitted, that in England the common law remedy, under such a state of facts, was case according to the usual practice, but that debt would equally well lie. And that it could not be denied, that debt was the statute remedy. That the English statute and common law, in force at the time of the separation of this country from Great Britain, so far as the same was applicable to our institutions and circumstances, and not repugnant to any of our own statutes, formed a part of our common law. 1 Mass. 59; 2 Mass. 534; 2 Bin. 594; [Respublica v. Mesca] 1 Dall. [1 U. S.] 73. That the records and precedents of the courts of Rhode Island would fully prove, that the action of debt had been the uniform remedy in cases of this description, from the earliest times. That certain acts of the general assembly of Rhode Island, passed in the years 1700, 1749, and 1767, expressly made the English statute and common law the law of Rhode Island, in all cases not provided for by the statutes of the then colony, where the same was applicable. And that the statute of the state of Rhode Island, passed since the Revolution (in 1798) which was relied upon by the counsel for the defendant as effecting a repeal of the former acts, was in truth susceptible of but one conclusion, and that fully affirming the former acts, and sanctioning the opinion now advanced.

Upon the second point, whether, upon the

facts in this case there was in point of law an escape of the prisoner, it was contended:

(1) The defendant's giving to the prisoner the liberty of the gaol, as proved in the case, was an escape. That an escape may be committed, whilst the prisoner remains within the walls of the prison, is established by a train of decisions, extending from a period long anterior to the time of Lord Coke down to the present day. In Westby's Case, 3 Coke, 71, it is expressly decided, that an escape may be committed within the walls of the prison, and the court observes, "that the law doth adjudge one, who remains in prison to escape." So where a woman, a keeper of the prison, marries her prisoner, it is an escape of the prisoner, though he never leaves the walls of the prison. 1 Plow. 17; 2 Bac. Abr. 515, "Escape," B, 3; 3 Com. Dig. 601, "Escape," C. So where the inheritance descends to the prisoner, it is an escape, though he remains within the walls. 3 Com. Dig. 601, "Escape," C, 6. So when the prisoner is committed, and no one is at the prison to take charge of, and confine him. 3 Mass. 310. Committing a sheriff to his own gaol is also an escape. 6 Johns. 22. In Boyton's Case, 3 Coke, 44, it is said to have been adjudged as early as the 24 Hen. VIII. that prisoners on execution should not go at liberty within the prison. And the same principle is recognized and established in Dalt. Sher. 485; Dyer, 249; 1 Rolle, Abr. 817; 10 Vin. Abr. 83, "Escape," C, 1; 11 Mass. 161; 3 Mass. 101. It has been suggested by the counsel for the defendants, that these decisions are founded upon statutes. In this, however, there is a mistake; they are the principles of the common law, and in full operation long before the statute alluded to was enacted. 3 Com. Dig. 597, B, 1. And see the authorities before cited. This statute did not originate these principles, but made further ones, giving to keepers of certain prisons additional powers over their prisoners in specified cases, in order to oblige them to a more speedy compliance with their duty. 2 Bac. Abr. 512, "Escape," B, 1. In 3 Mass. 101–103, before cited, the common law principles and decisions are reviewed by the able and distinguished chief justice of the supreme judicial court of that state, and all the questions upon this point decidedly put at rest. It is observed by the adverse counsel, that the chief justice in one part of that opinion says that the prisoner's going to the pump within the limits was no escape, and hence would seem to infer his right to be upon the liberties. But in that case the prisoner had given bond for the liberty of the yard, and that was the reason, why the going to the pump was no escape.

Impressed with the high authority of this decision, and its conclusive nature, the counsel attempt to consider it as founded in some degree upon the statutes of that state, between which and those of this state upon this subject there is, they say, a difference. But its force and application cannot be so evaded. The court expressly treat of the common law, and distinctly state the principles of it. At common law, says the chief justice (page 101), the sheriff had power, &c., and refers to Dalton & Impey, who are clearly treating of the common law principles. Nor is there any material difference between the statutes of the two states. Their language is very similar, and their provisions are clearly the same, as far as they relate to any question included in the case at bar. 3 Mass. 103; Laws R. I. 1798, p. 224, §§ 8, 9. From these authorities then it is perfectly clear, that an escape may be committed, while the prisoner is within the prison walls. The reason seems to be plain; it is because he is not in legal custody there. By all the authorities, his personal presence is not enough to constitute legal imprisonment. But the person must be in safe and close custody, in strict ward, in the custody of a keeper, of competent authority to restrain him. It is settled by all the authorities, and admitted on the other side, that if the prisoner is without the limits although with a keeper, it is an escape. And yet the same authorities say, that if the prisoner is at his liberty within the prison, or is without it in custody of a keeper, it is an escape. The cases before cited put his being at liberty within the walls, and his being without them with a keeper upon precisely the same ground. It is clearly an escape in both instances.

Imprisonment consists of two great characteristics. It is a confinement or restraint of the person (1) in a proper place; (2) in proper custody. And if either of these is wanting, there is no imprisonment, and of course there is an escape. A debtor may be committed, and within the four walls, and yet as to the question of escape not a true prisoner, because not in proper custody, or rather in no legal custody at all. So he may be in actual custody by an officer with a legal precept, and of competent authority to restrain him, and yet if he is not restrained in a proper place it is an escape. Hence if a prisoner is ordered to court under a habeas corpus, and his keeper carries him out of the proper road, or stays too long, &c., it is clearly an escape. Hob. 202; 10 Vin. Abr. 83. Hence when the sheriff arrests one on execution, and carries him out of the direct road to the gaol, or loiters too long on the way, it is an escape, although the sheriff is with him. 1 Bos. & P. 26; 9 Johns. 329; 3 Com. Dig. 600. So by the laws of Rhode Island the prisoner must not only be in gaol but in custody. Dig. 1798, p. 196, "Form of Execution."

The reason and the justice of these principles seem to be plain. In the first instance, although the person or debtor is within the walls, yet he is not in custody; that safe

and close custody, which the law requires. The place is right, but the custody, the restraint, is wanting, and therefore there is an escape. In the second, there is an actual custody, but it is exerted out of its proper place, and therefore there is an escape; and in both cases the sheriff is undoubtedly liable. The statute of Rhode Island, of 1747 (Old Laws, p. 34), it is submitted, places this question beyond all doubt. It is "An act for the ease of prisoners for debts," and the first granting to prisoners the liberty of the yard. By this statute and its preamble, it appears, that persons were closely confined in scanty little rooms, under lock and key, to the injury of their healths. That if they had the liberty of the house, they would support themselves, &c.; and it was doubted whether a bond for this liberty was valid in law. The act then provides, that it shall be lawful for the sheriff to grant and allow to prisoners for debt apartments in the prison, and the liberty of the yard, on their giving bonds to the sheriff for the use of the creditor, to remain true prisoners, &c. By this act it is perfectly demonstrated, that no sheriff ever dreamed he could grant the liberty of the yard to a prisoner upon any terms whatever; and the doubt was, whether, even with a bond, he could grant the liberty of the house. Without such bond, no pretence of such a right is even suggested. This act and all the subsequent acts put the liberty of the house and of the yard upon the same ground precisely; that of previously giving bond with sureties. This statute is not merely explanatory, but grants new powers, and makes new provisions. It provides that it shall be lawful to grant or allow these favours to prisoners on bond. And if it should be a fact, that previous to this statute sheriffs had occasionally indulged prisoners within the prison walls, upon a supposition of right, the statute most unquestionably repeals that right, and prohibits that indulgence in future. It explicitly and emphatically prescribes the mode and condition upon which, and upon which alone, the liberty of the house or yard can be granted to a prisoner. See 11 Mass. 162, 633; 7 Mass. 101.

The statute in question is similar in its provisions to all the subsequent statutes on the subject, except the bond is required to be given directly to the creditor, and the rate of interest has been occasionally varied. The statute of 1798, which is now in force, is also conclusive on this point. Dig. 1798, p. 126, §§ 8, 9. The eighth section, like the former act, prescribes the only terms, upon which the liberty of the house or yard can be granted to debtors. The language of both acts is similar. Independently of these provisions the prisoner must be kept in that safe and close custody, designated by the common law, and established by the current of decisions already referred to. And this is fully confirmed by the ninth section (page 127), which provides, that if the bond given for the enlargement of any prisoner is sued, &c. the principal and his sureties shall not have the privilege of the house and yard, but shall be committed to close gaol. This section calls the liberty given, an enlargement, clearly implying that the restraint, which before was limited to close and safe confinement in strict ward, is enlarged to the house and yard. And further, the principal and sureties are to be committed to close gaol. Now this section did not introduce any new kind of restraint or imprisonment as to this class of debtors; it merely intended, that they should be in the same custody, and under the same restraint, that debtors were, independent of the statute, that is, safe and close custody in the prison.

The counsel for the defendant has alluded to the decisions of New York and Connecticut, in support of his argument. The statutes of those states and the regulations of their prisons are, it is believed, totally different from those of Rhode Island. In New York, the court consider the liberties of their gaols similar to those of the Fleet and Marshalsea. In Connecticut, the liberties are fixed and settled by the supreme court, and their use by prisoners allowed upon such terms as they judge expedient. 1 Back. Sher. 165 et seq.; 2 Back. Sher. 2, 8, et seq. Whether the decisions in New York are correct or not, may, I apprehend, be seriously doubted. In both states, judicial decisions are founded upon state regulations, which make a part of their system of local law, and can have no influence here, where the statutes are essentially different. It has already been remarked, that our statutes and our common law upon the subject in controversy are similar to those of the state of Massachusetts, the decisions of whose laws upon every point involved in the case at bar are clearly in favor of the plaintiff. In New York, the ancient common law has been recognized as existing in England, as contended for by the plaintiff's counsel. It is however considered, that their statutes have modified it relative to sheriffs. gaols and gaol liberties. Their statutes are in a great measure a compilation of the English statutes, embracing that of 8 & 9 Wm. III. Under these statutes their courts have adjudged the liberties to be a mere extension of the prison walls and which the sheriff cannot refuse a prisoner, who offers competent security. When upon the liberties (with or without bond) the prisoner is reputed to be in the keeper's custody, and if he departs, the keeper can retake him. But the case here is totally different. When a bond is given, the custody of the keeper is at an end, and should the prisoner depart from the gaol yard, it is not to be pretended, that the keeper or sheriff, or the committing creditor, can retake and imprison him, nor that the sheriff is liable for an escape. In the case at bar, no bond of any kind was taken. Upon any principle whatever, therefore,

the decisions in New York can afford no defence to the present case. Jansen v. Hilton, 10 Johns. 549.

(2) It was further contended on the part of the plaintiff, that making the prisoner turnkey, and giving him the keys of the gaol was also an escape. The reason assigned in the books, why these acts constitute an escape is, that the prisoner having the keys of his own prison is no longer in restraint; he is not in safe and close custody, nor in strict ward. And although he may remain within the walls, it is nevertheless an escape, as he is not there by restraint. He cannot be said to be in custody of the sheriff, when that custody has been voluntarily relinquished, and the means of enforcing restraint, or continuing the custody, voluntarily surrendered to the prisoner. Such a case is adjudged to be an escape, for the same reason, that committing a sheriff to his own gaol, or a woman keeper marrying her prisoner, or the inheritance descending to a prisoner, are adjudged escapes. It is because there is no legal custody. Platt's Case, 1 Plow. 36; Cas. t. Hardw. 296; 3 Com. Dig. 601, "Escape," C. "If the sheriff makes a prisoner gaol keeper and gives him the keys, it is the escape of the sheriff." 5 Mass. 312. "For the prisoner (say the court), by being the keeper, and having the keys, is no longer restrained of his liberty." The reason is obvious. He cannot confine himself. Imprisonment is actual restraint by external power, having the right to restrain; but a man cannot exert this power upon himself, and the moment it is attempted, his prison doors are open and he is free. It is argued on the other side, that the turnkey, in the case referred to in the books, actually left the prison and walked into the street, and in that way committed the escape, and 3 Com. Dig. 601, is cited. But the departure of the turnkey from prison is not the escape spoken of in the authority, nor was it the foundation of the action. He returned before action brought, and was within the walls. In cases of involuntary escape, return before suit is equal to capture on fresh pursuit, and is a good defence. If such a defence would have availed in that case, it would have been made, for it is not pretended, that any permission was given to leave the gaol, except delivery of the keys. But it is not pretended by any of the authorities, that such a defence would be sustained, and for this plain reason. The escape was voluntary in the sheriff; the escape was completed within the walls, the moment the keys were delivered to the prisoner, and his being without the limits was only evidence of the escape being voluntary on the part of the sheriff.

(3) The plaintiff's counsel also insisted, that Stephen Witmarth, the keeper, having been committed to gaol was an escape in the prisoner. It seems to be clear upon authority, that committing the keeper, is an escape, not only of himself, but of all the prisoners, of whom he was the keeper. 2 Bac. Abr. 515,

"Escape," B, 3; Dalt. Sher. 487; 10 Vin. Abr. 78, "Escape," A, 2, 12; Style, 465; 1 Keble, 202, pl. 2; 3 Com. Dig. 601, "Escape," C. The reason of this principle is obvious. When the keeper is committed, it is a termination of his authority. He cannot be the keeper of a prison, in which he is a prisoner. In contemplation of law he is supposed to be locked up, and his ability and power to act are gone. "When the underkeeper (gaoler) is committed to prison, his employment is thereby determined." Per Sewell, C. J., 11 Mass. 184. In 5 Mass. 312, it is decided, "that committing the keeper is an escape," and on this ground, that he cannot keep himself. This is the true foundation, I apprehend, of all the decisions on this point, that his imprisonment ends his authority as keeper; so that he can neither restrain himself nor others. And his authority being so at an end, the prisoners are all without a keeper; they are not in safe and close custody. In fact, they are in no custody at all, either actual or constructive, for there is no person there, who does, or who has a right to, have them in custody. And this by all the authorities is clearly an escape. Some of the cases say, it is an escape, unless the keeper first secure his prisoner. In this case it is in proof, that Joseph Witmarth was not secured, but that he had the same liberty in and over the house, and the custody of the keys, in the same manner, while Stephen Witmarth was committed, as before. It is also in proof, that no new keeper was appointed; nor was the sheriff at the prison according to the recollection of the witnesses, while Stephen Witmarth was in confinement.

Whipple & Burgess, for defendant, contended that an action on the case, and not debt, was the proper remedy for the plaintiff. The injury alleged is an escape. This is a tort. The remedy for a tort should be such an action as will give damages proportionate to the injury. If a debtor, who has no means of making payment, be suffered to escape, what can be the damage to his creditor? Imprisonment cannot coerce payment from the totally insolvent. It would be otherwise, if a rich, obstinate, and fraudulent debtor were imprisoned. Imprisonment might coerce him to make payment. Hence the common law, with all the wisdom of common sense, gives the action on the case as a remedy for an escape. 10 Vin. 77; 2 Inst. 382; Cro. Jac. 658. By St. 1 Rich. II., c. 12, an action of debt is given against the warden of the Fleet, if he permits prisoners in execution for debt to escape. By an equitable construction of this statute it extends to all sheriffs and other keepers of prisons. This statute was enacted A. D. 1376, about 450 years ago. Since that time the subjects of the crown of Great Britain have had their option in cases of escape, to pursue their remedy, either by action of the case or action of debt.

It is contended by the counsel for the plain-

tiff, that the statute of Westm. II., giving the action of debt, is not now in force in this state as an English statute, but as common law. On the other hand we contend, that the statutes of England never were in force in Rhode Island, as common law. That although in other states, many English statutes in force at the time of the emigration of our ancestors were justly considered as a part of their common law; yet the case was different in Rhode Island, because our assembly did not leave to the courts the task of deciding what statutes should be in force and what not, but performed that task themselves from time to time. In 1700, all the English statutes were "introduced into practice" by an act of our assembly, in cases in which we had no statute of our own. Afterwards, from time to time, our assembly specified a part only of the English statutes, and declared that they were "hereby" introduced into notice. Many acts were passed on the subject, and the English statutes to be in force, diminished to a small number. A part of the statute of Westm. II., was introduced, and we contend, that that excludes all other parts. In 1798, the laws of our state were revised, and the fifth section reads thus: "That in all cases, in which provision is not made, either at common law, or by the statutes aforesaid, the statute laws of England, which have heretofore been introduced into practice in this state, shall continue to be in force, unless the general assembly shall especially provide therefor." The preamble to that section is important; "And whereas in the aforesaid Digest, statute provision may not have been made in all cases, unprovided for at common law," "Be it enacted," &c., as above. In 1767 the legislature by an act, designate particular acts, of parliament, to be in force in this state, beginning at a period long antecedent to the emigration of our ancestors. Among these acts is the statute of Westm. II., "de donis conditionalibus." Whether it was the intention of the legislature to introduce the whole of this, or only such parts as relate to estates tail, is very doubtful. Much of that voluminous statute relates to local affairs; such as taking fish in particular rivers in England. The whole never could be practised upon here. The statute of Gloucester, the whole of which is expressly introduced, relates to subjects of general concern entirely, and so of the other statutes, the whole of which are introduced.

The counsel, however, for the plaintiff may take their choice; if a part only was introduced, it was that part relating to estates tail, and all the other parts are excluded. If the whole was introduced, it was introduced as an English statute. And when it was repealed in 1798, no practice under it can be set up as common law. If the legislature in 1798 meant to repeal the statute, they meant of course to put an end to the practice under it. It will be observed, that the language of the legislature in 1767, relative to the English

statutes designated, is, that they are hereby introduced. Their language in 1798, is, the statutes of England "heretofore introduced into practice." Introduced by whom? By the courts of law? No. By the bar? No, but by themselves. They did not mean to leave that duty with the courts, as in the other states, Pennsylvania for instance. See a late case in Yates' Rep. Neither did they mean, that all the statutes of England in force at the emigration of our ancestors should be considered as common law here. For if all those statutes were in force as common law, why introduce a part of them as English statutes? If they had been silent as to all statutes previous to the emigration, and introduced some, that were passed since, it might be concluded, that they were silent, because they considered the ante nati, as already in operation; and introduced the post nati, because they would otherwise have no force. But inasmuch as in 1700, they introduced all the English statutes, and in 1767 introduced by a new revision only a part, those that were omitted, were in effect repealed. They were not to be practised upon any longer. It will also be observed, that in the act of 1767, it is said, that on subjects not provided for by our own statutes, nor by the acts of parliament aforesaid, "the laws of England" are to govern. That expression undoubtedly means the common law, as contradistinguished from acts of parliament. It would be taking great pains to select a part of the acts of parliament, and then by one stroke of the pen introduce the whole, if we should give to those words a more enlarged meaning.

Inasmuch then as the legislature of this state have undertaken to select from the English statute book certain acts of parliament, what they have selected were in force as English statutes, and what they left behind, they meant should not be in force. If they took a part of the statute de donis only, the other parts are excluded, and no practice of the courts or bar can give them life. Suppose the whole of the statute de donis to be introduced by the statute of 1767, did the legislature repeal it in 1798? It is evident, that in 1798, the legislature did not mean to continue in force all the English statutes, that were introduced in 1767. What part then did they mean to continue in force? Why, such parts as related to subjects, concerning which no provision was made by our own statutes, or by the common law. It will not do to say, that the English statute makes a better provision than the common law; but does the common law provide any remedy against a sheriff for an escape from gaol? I say, that it does provide a remedy, and a better remedy, than the English statute. An action of the case is the remedy at common law, and considering the feebleness of our gaols, the only remedy, that ever ought to be allowed of. In England, where the sheriff provides his own prison, and where, from

their very structure, an escape without some fault of the jailor is hardly possible, debt may be in most cases a proper remedy. But in Rhode Island, where gaols are built by the government, and so little different from common dwelling houses, that escapes without any fault of the jailor are of common occurrence, the action of debt would be unjust and oppressive in its operation.

The counsel for the plaintiff give up the action of debt as a statute remedy, and say it is in Rhode Island a common law remedy. This action of debt, which is drawn fresh from the bowels of a feudal statute, this action of debt, which in England for six hundred years has been used as a statute remedy, is all at once in Rhode Island changed in its nature. The consequences of admitting such a construction are indeed alarming. The judicial, is placed above the legislative authority, and no repeal of any statute is of any force. The legislature put an end to its existence as a statute law, and the courts resort to the practice under that very statute, as evidence of common law; thus continuing in force under a new name the law, which was intended to be repealed. If our legislature never had introduced any of the English statutes, but they had been practised upon by common consent, that common consent would have formed the unwritten common law. But with us, the English statutes were introduced by matter of record, and if it exists now, it must be as a record. It has none of the features of common law about it. But supposing the action of debt well lies in this case, the next question is, whether in point of law, the prisoner, Joseph Witmarth, did escape.

(1) The plaintiff relies on three facts as evidence of an escape: (1) That Joseph Witmarth, the prisoner, had the liberty of the gaol house; (2) that he was made turnkey; and (3) the commitment of Stephen Witmarth, the jailor. The first proposition of the plaintiff is, that a jailor is guilty of an escape, by giving to his prisoner the liberty of the gaol house. The affirmation of this proposition throws the burden of proof on the plaintiff. Now so far from showing this to be a settled principle, we state boldly, perhaps imprudently, that there is not even a dictum in the books in favor of it. Every thing, that is said in the old books and repeated by Judge Parsons in 3 Mass. 101, 102, against suffering a prisoner to go at large, either within or without the prison, relates, as that great man expressly says, "to sheriffs, who have the appointment of their own gaols for debtors in execution." The reason and necessity of such a principle to such a keeper are obvious. The whole kingdom may be made a prison. But that the keeper of a gaol, erected by public authority, cannot give to his prisoners the liberty of the gaol house, is a doctrine never contended for before. Even under the statute of Westm. II., keepers of prisons were impowered to confine their prisoners in irons, but were not

obliged to do it. "They may do it," says Lord Coke, "if need be." A much stronger ground may be contended for, consistently with authority, than the case at bar requires, not only, that a jailor has a right to grant the liberty of the prison house, but of any part of the prison. Chief Justice Parsons, in his charge to the jury (3 Mass. 88), says expressly, that they must find for the defendants, unless they are satisfied, that Willis went to the outer pump. His going to the pump within the picket fence, but without the prison house, was decided not to be an escape. It is true, that in another part of the case (page 103) he says, that the prisoner "must be confined not only within the prison, but within the gaol house." This difference probably arises from his construction of the statute of Massachusetts, relative to prison bonds. But he no where contends for the doctrine, that the liberty of the house may not legally be allowed. Debtors confined under the statute of Westm. II. were considered in the light of criminals, and as to them a strict rule prevailed. The whole doctrine of salva et arcta custodia comes directly from that statute. It is a stranger to the common law. "There is a great difference, says Viner, (title "Escape," C, 2), between the restraint of prisoners in execution under this act for arrears of rent, &c." and ordinary cases. In Vin. tit. "Escape," C, 6, it is said, "that a man in prison, &c. ought not to go out, though with a keeper, but yet imprisonment must be custodia et non ponea, &c." The ancient authorities relative to the ease and favour, which the marshals and wardens might legally shew their prisoners, come nearer to our case. because their prisons were erected, at least governed, by public authority. From those authorities it appears, that prisoners, unless restrained by an order of court, were allowed the liberty of the prison house and yard, and in some instances of an adjoining garden. 10 Vin. Abr. A. 17; Noy. 38; Bulst. 145; Poph. 85; Cro. Eliz. 366.

The above cases shew, that by the ancient common law, previous to the statute establishing rules to prisons, the keepers of prisons of every description might legally grant to their prisoners the liberty of the prison house. Since that statute it has been adjudged, that the rules are but an extension of the prison walls, and that the same liberty, which might formerly be granted by the sheriff within the walls, may now be legally granted within the rules. 2 Term R. 120. It will be at once admitted by the counsel for the plaintiff, that if the sheriff of the county of Providence has a right to grant the rules without bond, he has a right to grant the liberty of the house. This construction of the English statute has been adopted in Connecticut. 1 Back. Sher. 177; 2 Root, 174. And in New York (6 Johns. 121), Spencer, Justice, says, "It has frequently been decided in this court, since the statute allowing gaol liberties, that a sheriff

may let a prisoner in execution go within the liberties, without taking a bond, which is for his indemnity." The force of these decisions cannot be evaded by a pretended difference in the statutes of New York, Connecticut, and Rhode Island. There is no substantial difference between them. The phraseology of the English statute is admitted to be somewhat stronger than that of Rhode Island, but not sufficiently so to alter the construction in this respect. The decision in 3 Mass. is on the peculiar language of their statute.

But there is another reason in favor of the English construction, that applies with peculiar force to Rhode Island, and which perhaps has no influence in Massachusetts. It is this: In 1720 an act of our general assembly was passed, introducing all the statute laws of England in cases, in which we had "no law of the state in particular." At that time we had prisons and prison rules, and we have abundant proof to show, that sheriffs have been in the habit of granting the rules to prisoners sometimes with, and sometimes without bonds, as far back as the memory of man extends. Now we ask, how our prison rules were established? The common law of England is silent on the subject, and we had no statute of our own, and yet we had prisons and prison rules. The answer is easy and undeniable, the English statute was in force in this state. We practised under it, probably for a century, and by a comparison of the act of 1747 of our general assembly with the English statute, it will be seen, that it was not the intention of the legislature to introduce a new rule, but to confirm and establish the then prevailing practice. Doubts had arisen on the subject, and to remove them that act was passed. The language of all our subsequent acts is the same substantially, as that of 1747. So much has this subject of prisons and prison rules been considered a matter entirely of usage and practice in Rhode Island, that as late as the year 1800, it was found, that the limits of the gaol yard (or rules) in the county of Providence, depended entirely upon tradition. We know its extent by no record, no law, no written document whatever; and in that year the legislature confirmed by an act, what had been established by usage. However different therefore the statutes and usages may have been in Massachusetts, all our laws on the subject are of English origin, our practice previous to 1747 was the same as in England. Since the act of the assembly in 1747 sheriffs continued to give what we call the liberty of the yard without bonds; and that practice continued in some of the south counties until within three years. It was enough to put a stop to the practice, that doubts were entertained on the subject by some gentlemen of the bar. It is hoped, that those doubts will be removed by a judicial decision.

One other argument against the proposition, that a jailor has no right to allow to his prisoner the liberty of the gaol house, and we shall dismiss this part of the subject. It is a fact, that that liberty has been granted in England and in this country, as long as we have any knowledge of the subject. Many prisons in England are now standing, that were built centuries ago. They are like Newgate, the Fleet, and other prisons, that were rebuilt after the riots in 1780. They have yards adjoining them for the accommodation of the prisoners. Newgate, which is the sheriff's prison, was built in the 13th century, and if we mistake not, of the same form, though not so large as the present building. There is not a prison in London of any note without a yard, into which the prisoners, even the criminals, are daily admitted. We can find no record of any actions ever having been brought on account of these indulgences. In all the New England states, and in New York (probably in all the states in the Union), jailors give the liberty of the gaol house to such of their prisoners, as they choose to confide in. A usage so uniform and so ancient forms a rule of itself, at least it requires a clear and well settled rule to overturn it. If however the court should be of opinion, that usage is not decisive, was there an escape of the prisoner? Let it be remembered, that this action is brought against the sheriff for an alleged escape of Joseph Witmarth, and that this man was committed on the suit and execution of the plaintiff, and that ever since that time the said Joseph has remained, in consequence of that commitment, within the walls of the prison. The action is therefore founded on an escape implied, not an actual escape; an escape in law, not in fact; not by going at large, and whithersoever he would, but by staying in confinement within the walls of a prison. It is the first action of this kind brought for an implied escape, to be found in all judicial history. We agree that certain obiter dicta of certain judges intimate, that there may be an implied escape, and that by one statute of England a certain act of the sheriff may be deemed an escape. But the books furnish no instance of an action in any such case. Westby's Case most resembles an action for a constructive escape. The old sheriffs of London neglected to assign the prisoner on the execution of Westby to the new sheriffs. He escaped and went at large. An action for the escape was brought against the old sheriffs. It was adjudged to lie. They had neglected to assign the prisoner, which the court decided was the same thing, as if they had discharged him from commitment. There had been an actual escape, and the question was, to what time it referred. The court adjudged, that it referred to the time, when the old sheriffs, by neglecting to assign the prisoner, permitted and gave him liberty to

go at large. Coke, pt. 3, p. 71. In this case had the new sheriffs detained the prisoner there would have been no escape.

The doctrine of "salva et arcta custodia" is no part of the common law, but the production of statute. Coke in his 2 Inst. 387, commenting on the statute of Westminster, as it relates to the strict confinement of prisoners, says, but this the "gaoler could not do by common law, as by all our ancient books it appeareth." How prisoners for debt in execution came to be strictly confined, we learn from 10 Vin. p. 83. Boyton's Case, 3 Coke, 49. In 24 Hen. VIII., a decree and order were made in the star chamber for that purpose; and the keepers of all prisons in London, were directed to observe the said order and decree, upon pain of £100. After this time, and in 9 James I. (Bulst. 145), in the case Scriven v. Wright, on motion of the plaintiff, that the defendant had too much liberty, though committed on plaintiff's execution for debt, and that he lived at his pleasure without any restraint, and therefore, for the more speedy payment of his debt, the court was moved, that he be in salva et arcta custodia the court ordered, that he should be restrained of his liberty. Was the sheriff or keeper charged with an escape? No. Yet the prisoner had lived at his pleasure without any restraint. Doubtless, he had had the liberty of the prison house, yard and liberties. In Beecher's Case, Noy, 38, 10 Vin. Abr. 75, the defendant was in execution in the Fleet for £12,000, and being there, he had the liberty of the garden, and to play at bowles; on motion for the creditors, it was ordered by the court, that he should be in strict custody in his chamber. It was said by Popham, and denied by none, that if the prisoner be confined to his chamber by order of court, and the warden of the Fleet suffer him to have the liberty of the house, it will be an escape. There was no escape alleged in this case, yet Beecher had had the liberty of the house and garden, nor could there have been an escape by his having these liberties, unless he had been sentenced by the court to arcta custodia, in his chamber. The doctrine of close confinement under lock and key, and in irons, for debt on execution was unknown to the common law. The true common law doctrine seems to be this, that whenever a man is committed to any prison on execution for debt, the court may make an order, that such prisoner shall be confined to his chamber, but if no such order be made, the keeper may give him the liberty of the house. If he actually escape, it will be a voluntary escape as to the sheriff, because he might, if needful, have confined the prisoner under lock and key, or if refractory, in irons. Bac. tit. "Escape"; Vin. Id. This power of the English courts seems to be incident to their judicial authority, and to extend alike to all the prisons in England. The statute of Westm. II. c. 11, aided by the authority of the star chamber, may have originated some new rules concerning keeping prisoners. But all the cases concerning arcta et salva custodia, are confined to the period of Henry VIII., and the three succeeding reigns. Even before the statute of 8 & 9 Wm. III., the system seems to have been gradually changing.

(2) But we are told, that appointing the prisoner a turnkey was an escape. In Rhode Island there is no such officer known in the law as a turnkey, and if there were, the said Joseph was never appointed to that office. By the statute, the sheriff may appoint deputies and a gaoler. He cannot appoint a turnkey, nor can the gaoler appoint any kind of deputy. Neither is it in evidence, that either the sheriff or gaoler ever appointed the prisoner, or attempted to appoint him, the turnkey of the prison. The most, that is sworn to, is, that he occasionally locked and unlocked the inner doors. He was never empowered to go on the outside of the gaol and lock it up. He never had the control of the keys of his own prison. This theory of the escape of a prisoner by being appointed turnkey is founded on a state of facts, which does not exist in this state. It supposes, that the turnkey, in order to discharge the duties of his appointment, must of necessity be without the walls of the prison. This is not true in fact, for in every gaol in this state the jailor resides within the walls of the prison, and the doors are open all day, and are locked at night on the inner side. In England, and in most counties of Massachusetts, the gaol and the jailor's house are separated and distinct buildings, and the gaol is locked up on the outer side. He, who exercises the office of turnkey, must therefore of necessity go without the walls of the prison, both in England and in Massachusetts. It is for this reason, that appointing a prisoner a turnkey necessarily operates as an escape.

(3) But the plaintiff further says, that the sheriff permitted the prisoner to escape, because Stephen Witmarth, the gaoler, was committed to gaol after the commitment of the prisoner, and before the commencement of his action. This proposition is attempted to be proved by the obiter dicta of Glyn in Style, 465, and on the supposed case of Bendison v. Lenthall, 1 Keble, 202, and 10 Vin. Abr. 76. Bendison had judgment against Lenthall, and prayed to have him in execution. The court said they would appoint a new marshal, unless he would pay the debt, and so commit him; otherwise it would be an escape of all the prisoners. Lenthall was marshal. If Lenthall had been committed being marshal, and an action had been brought against him for the escape of a prisoner in his custody, and he had been adjudged guilty of an escape, then would the authority have been in point, provided the sheriff had been committed, instead of Stephen Witmarth, the gaoler, in the case at bar. But the case is no authority, because

it is not an adjudged case, and because it is contrary to the principles of common sense. To commit the marshal cannot be an escape of the prisoners under him, because he cannot be committed. Three things are necessary to a commitment; first, an officer to make a commitment; second, a prisoner to be committed; and, third, a gaoler, sheriff, or marshal, to receive the prisoner. In the case cited, and in the case at bar, there were but two persons; Lenthall the marshal could not be committed, because there was no person to whom to commit him. If he could not be committed, then it is idle to say, it would be an escape of all the prisoners to commit him. Could he be committed to the custody of a third person, when there was no third person to receive him?

So in the case at bar, Stephen Witmarth, the gaoler, was arrested and brought to the gaol. He was either committed, or he was not committed. If he was committed, it must have been to some third person, competent to receive him and hold him in custody; this could have been none but the sheriff. If the sheriff were there to receive him, then was he there to keep the gaol and hold the custody of all the other prisoners; and therefore, Joseph Witmarth did not escape. If he were not committed, it was because the sheriff was not there to receive him, and he could not be committed, unless to some third person, to receive and to hold him in custody, that is, to the sheriff. But if he was not committed, he was suffered to go at large, and might keep the gaol, and hold the custody of all the other prisoners.

STORY, Circuit Justice. This cause has been argued with great ability and learning; and I have received much light and instruction from the elaborate discussion, which it has undergone. I have considered the question with as much deliberation and care as I have been able; and it now remains for me to pronounce that judgment, which on the best reflection I have been able to form.

The first question is, whether an action of debt lies in Rhode Island for the escape of an execution debtor. That debt lies in England in such a case, at least, since the statute of Westm. II. c. 11 (13 Edw. I.), and the statute of 1 Rich. II. c. 12, has not been denied at the bar; and is indeed supported by a weight of authority altogether incontestible. See 2 Inst. 377, 379, 380, 382; Jones v. Pope, 1 Saund. 34, and note 1; Id. 36; Platt v. Sheriffs of London, 1 Plow. 35; Alsept v. Eyles, 2 H. Bl. 108; Bonafous v. Walker, 2 Term R. 126. The only point is, whether that remedy has either by usage or statute been incorporated into the law of Rhode Island. It is not necessary, in my judgment, to consider how far the common law and statutes of England, applicable to its situation, were to be considered as introduced by adoption into the colony of Rhode Island at its first settlement, or under the charter of Charles II.,—though certain-

ly the current of American as well as British authority sets very strongly in favour of the affirmative (5 Bac. Abr. "Prerogative," C; 2 P. Wms. 75; Blankard v. Galdy, 2 Salk. 411; Com. v. Knowlton, 2 Mass. 530; 3 Bin. 595), —because there is an express colonial statute on this subject. By the act of Rhode Island, of the 30th of April, 1700, it is enacted, "That in all actions, matters, causes, and things whatsoever, when no particular law of this colony is made to decide and determine the same, that then, and in all such cases, the laws of England shall be put in force to issue, determine, and decide the same, any usage, custom, or law to the contrary hereof notwithstanding." It is too clear for argument, that this statute completely adopts the English statute, as well as common law, in all cases not otherwise provided for; and as no colonial statute existed touching remedies for escapes, it follows, that the remedy of an action of debt was virtually coupled with the local law. Assuming this to be the correct conclusion, and it seems to me undeniable, it remains only to inquire, whether by any subsequent statute the operation of this act has been suspended or repealed. There is no pretence of an express repeal; but an attempt has been made to deduce a repeal by implication from statutes subsequently made. The statute of 1767, after expressly declaring, that the courts of the colony shall be governed by certain statutes of parliament, which it enumerates in detail, as "hereby introduced into this colony," proceeds to provide in the second section, "that in all actions, laws and things whatsoever, where there is no particular law of this colony, or act of parliament introduced for the decision and determination of the same, then and in such cases, the laws of England shall be in force for the decision and determination of the same." It does not appear to me, that this statute in the slightest degree varies the operation of the act of 1700; it is merely affirmative of its provisions. The enumeration of certain statutes, as introduced, cannot justly be considered as denying the adoption of any others; but was probably inserted ex majori cautela; and at all events the second section completely repels any such constructive repeal. Then comes the act of 1789, which, after declaring the Digest, then made of the statutes of the state to be in force, and reciting, that "in the aforesaid Digest statute provision may not have been made in all cases unprovided for at common law," enacts, "that in all cases, in which provision is not made, either at common law, or by the statutes aforesaid, the statute laws of England, which have heretofore been introduced into practice in this state, shall continue to be in force, until the general assembly shall expressly provide therefor." Dig. 1798, p. 78, § 5. Now I do not think it material to inquire, whether it be the common law of England, or the common law of Rhode Island (supposing there is a difference), which is alluded to in this statute, though upon sound principles of construction it seems difficult to

avoid the conclusion, that the latter was .intended (Com. v. Knowlton, 2 Mass. 530, 534; 3 Bin. 595); nor whether the common law of Rhode Island, at least since the act of 1700, is not to be considered the common law of England, as modified and amended by the acts of parliament, and the local usages and doctrines of the colony; for in my view of the question, the effect of the act of 1798 will be the same, which ever construction is adopted. Notwithstanding what is argued by counsel in Platt's Case, 1 Plow. 35, to the contrary, there does not seem any reason to suppose, that debt was a remedy for an escape at the common law; for according to all analogies of that law, it lay not in cases of tort, but of contract only, where the claim was for a sum certain; and it seems impossible to conceive, that the injury to the plaintiff in cases of escape could always be a sum certain. From the nature of the case, it is a tort, sounding in damages, and perpetually varying in measure and extent. The statutes of Westm. II., and 1 Rich. II., were, in my judgment, introductive of new law; and such seems to have been the general if not the universal opinion of the profession, so far as it can be gathered from judicial decisions. Bac. Abr. "Escape," F; Bonafous v. Walker, 2 Term R. 126. Assuming therefore, that the common law referred to in the act of 1798 is the common law of England, as the counsel for the defendant contends, it establishes only, that debt for an escape was not a remedy given by that law, or in the language of the act, it is "a case in which provision is not made at common law." It would be too narrow a construction to hold, that if there was some remedy at the common law, the act of 1798 did not save a new statute remedy, introduced by practice into Rhode Island. The obvious purpose was to save all English statutes, then in force, which gave remedies and rights unprovided for by the common law, or by the state statutes. And at all events the act is merely affirmative, and in no respect touches former statutes, with which the provisions in the Digest are not inconsistent. That the remedy of debt for escapes had been introduced into practice in this state is clear from the extracts from the judicial records, with which I have been furnished, since the year 1767. And the legal conclusion from these extracts is greatly fortified by the language of the statutes of 1700 and 1767. Without going more at large into the subject, I am satisfied, that debt is a proper and legal remedy in Rhode Island in cases of escape.

The other question is of much greater importance and difficulty. At the threshold of the examination, which it is my duty to make, I wish to declare, that the decisions of other states upon the doctrine of escapes can have no authority in this case, unless so far as they rest upon the common law, or upon English statutes. Whatever may be the correctness or incorrectness of any decisions founded upon expositions of local statutes and usages in other states, we have

nothing to do with them. The question is res integra here, and the parties have a right to have it settled upon principle.

I shall consider the case under the three aspects, in which it has been presented by the counsel: (1) Whether suffering the prisoner to go at large within the walls of the gaol was an escape; (2) whether the prisoner's being entrusted with the keys, and performing the other duties of a turnkey or assistant to the gaoler was an escape; (3) whether the commitment of the gaoler to the gaol during the prisoner's confinement without any new appointment of a keeper was an escape.

In Rhode Island (as in most, if not all of the other states), the county gaols (in which alone prisoners in execution are authorized by law to be confined) are built and maintained by the public. As early as 1729 an act of the legislature required a gaol to be erected in each county, where one was not already erected, meet and convenient for the security of prisoners. The sheriff in virtue of his office has the custody of the gaol, and is authorized to appoint a keeper of it, and is made responsible for the neglect and misfeasance in office of his deputy and gaoler. Dig. 1798, p. 400 et seq. The limits of the gaols, as far as any evidence has been laid before the court, were probably fixed from time to time by the legislature; and the present limits of the gaol in Providence were fixed by a resolve of the legislature in 1800. At what time the liberty of the yard was first authoritatively granted to prisoners confined for debt does not directly appear. But very probably it did not exist anterior to the act of August, 1747. That statute after reciting in its preamble, that honest and unfortunate men are "thrown into prison, where they have been closely confined in scanty, little rooms under lock and key, to the prejudice of their health and ruin of their families, many of them being of some occupation, that if they had the liberty of the house, they could at least support themselves and families by their business;" and reciting also, that a doubt had arisen, "whether a bond made to the sheriff, that a man shall be a true prisoner, and not make an escape, is valid in law;" proceeds to enact, that it shall be lawful for the sheriff to allow to "any person imprisoned for debt upon mesne process or execution a chamber or lodging in any of the apartments belonging to such prison, and liberty of the yard within the walls and limits thereof, upon reasonable payment to be made for such chamber room, such person giving bond," &c. with sufficient sureties, &c. upon the condition specified in the statute. That condition is in substance, that he shall continue a true prisoner in the custody of the gaoler and his deputies and servants within the limits of the prison, until lawfully discharged, without committing any manner of escape. And in case of any escape, it authorizes an assignment of the

bond to the creditor. This statute is in substance preserved in the Revision of 1798, with an additional section, that when judgment is obtained upon such prison bond, neither the principal nor the sureties thereon shall be entitled to any relief under the act, "but they shall be committed to close gaol" until the execution is paid or discharged. The form of execution provided by the legislature commands the sheriff, &c. for want of goods and chattels to take the body of the judgment debtor, and him to "commit unto the county gaol, and in custody to keep within the said gaol, until the execution is discharged." These are all the statutes of Rhode Island bearing on the subject, and they leave the question of what constitutes an escape to be decided according to the common law and statutes of England adopted in that state.

Was it then an escape at common law to allow a prisoner to go at large within the walls of the gaol? It is said, and truly, that to suffer a prisoner to have greater liberty than the law allows, is an escape; but this leaves the question exactly, where it was before, for the inquiry still is, what is the liberty, that the law allows in such cases. It is also said, that the prisoners are to be kept in salva et arcta custodia. This is true; but it remains to inquire, what that safe and close custody is. By the ancient common law prisoners were not allowed to be kept in irons for the reason assigned by Bracton, "quia carcer, ad continendos non ad puninedos haberi debeat." Rom. Law, Brac. lib. 3, fol. 105; Fleta, lib. 1, c. 26; Mirror, Just. c. 2, § 9; Id. c. 5, § 1; 2 Inst. 380. And Lord Coke significantly observes, that where the law requireth, that a prisoner should be kept in salva et arcta custodia, yet that must be without punishment to the prisoner. 3 Inst. 35. The statute of Westm. II. c. 11, is the first instance, where authority is given to the sheriff, if need require, to keep the prisoner in irons, and that in terms, though not in consideration, is confined to servants, bailiffs, and receivers. And the very language of that act, which first gave the action of debt for an escape, declares, that the sheriff or keeper of the gaol shall take heed, that "he do not suffer him to go out of the prison" by writ of replevin, or other means, without the assent of the creditor and if he does, gives the action. The statute of 1 Rich. II. c. 12, which in terms applies only to the warden of the Fleet, but has been held by construction to apply to all sheriffs and gaolers, declares, "that no warden of the Fleet shall suffer any prisoner, there being by judgment at the suit of the party, to go out of the prison, by main prize, bail or baston, without making gree to the parties, &c." and if he does, it gives the creditor an action of debt. Selw. N. P. "Debt," p. 542, § 9; Bonafous v. Walker, 2 Term R. 126. Nothing can be clearer than that by the terms of these ancient statutes the action was not contemplated, unless the prisoner went without the walls of the prison; and there is some reason to infer, that nothing short of this was then supposed to be an escape. I have examined all the cases cited at the bar, and have made extensive researches to ascertain, whether there is any English case, in which it has been judicially held, that it is an escape for a prisoner to be permitted to go at large within the prison walls; or that locking up in a certain room is necessary to constitute "salva et arcta custodia." I find no such case, unless that cited from the star chamber be such, and upon that I shall have occasion particularly to comment. I exclude here from consideration the cases of constructive escapes from incompatible duties or rights, because they fall properly under another head. The general silence of the books upon such a doctrine raises a pretty strong presumption, that no such duty was imposed by law upon the gaoler to confine his prisoners in locked rooms. If his prisoners were restrained within the walls of the gaol, I cannot perceive, why in reason the confinement may not justly be deemed close and strict, especially as it is a confinement not for punishment, but for custody. The exigency of the writ of execution is to keep the prisoner in safe custody within the gaol, not that he shall be kept locked in confinement in any particular room within the walls. In contemplation of law it is an imprisonment, where the party is restrained of his liberty by force, or against his will; and therefore, says Lord Coke, he that is in the stocks, or under lawful arrest, is said to be in prison, although he be not infra parietes carceris, for there may be a prison in law, as well as in deed. 2 Inst. 589. A fortiori, a person may be said to be in close custody, where he is confined within the walls of the prison. Beecher's Case, Noy, 38, appears to me perfectly consistent with this doctrine. It is proper to recollect, that the Marshalsea and Fleet prisons are subjected to the entire control and order of the respective courts of king's bench and common pleas, and that these courts have authority to prescribe the limits and liberties, as well as the rules for the management and custody of the prisoners. Com. Dig. "Imprisonment," C. D. Beecher was imprisoned in execution for debt in the Fleet, and being there he had the liberty of the garden, and to play at bowles. And upon motion by his creditors, it was ordered by the court, that he should be in strict custody, in his chamber. "And it was said by Popham, which none denied, that if the party be confined to his chamber by order of court, and the warden of the Fleet suffer him to have the liberty of the house, that it shall be an escape." Now it may be admitted, that, if after an order by a court having competent authority, confining a party to his chamber, the gaoler suffer him to go at large

within the house, it is a violation of his duty, and is an escape. But the just conclusion from this is, that without such an order such a liberty would not be an escape. And this is corroborated by the report itself, for if the indulgence to Beecher had been deemed an escape in point of law, the proper remedy for the warden would have been an action of debt against the warden, and not an application to the court for the more strict confinement. And the report itself informs us, that such liberty was usually granted to the prisoners in the Fleet. If it had been inconsistent with what the law deems a safe and close custody, it seems incredible, that any court of justice should have allowed such a wanton abuse, thereby sanctioning an undeniable wrong. In the same maner I interpret the resolutions of the judges on occasion of the plague in London, as reported in Cro. Car. 466, and Hut. 129. The judges there proposed, that the prisoners might be removed to some house in the country, for the warden "there to keep them as prisoners sub arcta and salva custodia, as they should be kept in their proper prisons, and not to be as home keepers in their own houses." Not the slightest suggestion is made of the necessity of confining them in locked apartments within the prison. Small's Case, 2 Bulst. 148, stands upon the same ground. A motion was there made in court to have some redress in the prison of the Marshalsea for the government of prisoners there in execution, "who having so great liberty there in the prison, and in continually going abroad by bail and baston, so that they will lie there, consume their estates, and do not pay their creditors." Lord Chief Justice Coke said, that by the statute of 1 Rich. II. c. 12, prisoners sub custodia are not to go out of the prison by bail and baston, unless by the command or writ of the king, or by agreement of the parties, and that such kind of liberty given by their keeper without such warrant was an escape in law. And he added, "therefore we will confine them to be sub ferris in arcta custodia." The grievance here complained of was not, that the prisoners were at large within the prison, but that by bail, or baston,—which I presume means the custody of a keeper or tipstaff (Dalt. Sher. 140, 475),—they went without the prison, against the express provisions of the statute of Richard. And notwithstanding his lordship's harsh determination for the future;—the legality of which is very doubtful (Scriven v. Wright, 1 Bulst. 145),—it is perfectly clear, that the practice of allowing prisoners the liberties of the limits continued down to the period of the statute 8 & 9 Wm. III. c. 27, and received judicial sanction, and was then finally confirmed by parliament. In Lenthall v. Cooke, 1 Lev. 254, 1 Saund. 161, the legality of bonds taken by the keeper of the king's bench prison, upon granting the prisoners the liberties of the rules, was directly in question, and the court held them good, if not given for ease and favor, and gave as a reason, that the prisoners were so numerous, that the house could not hold them, but that they were permitted to lodge within the rules, and therefore there was good reason to take security for their true imprisonment, and constant usage had been to take such obligations. Now it is material to remark, that there was no pretence in the argument, that this indulgence had been granted under authority of any rule of court. It was a usage of the gaoler's; and if such indulgence had been an escape at common law, the bonds must have been void. The court therefore manifestly considered, that imprisonment within the walls was sufficient in point of law; and that the rules of the prison were to be deemed constructively the walls of the prison. The same case is reported in 2 Keble, 422, and Sid. 384; but comparing them together, they do not seem to me to vary the conclusion to be drawn from the more accurate statements of the other Reports. See, also, Mosdel v. Middleton. 1 Vent. 237; Case of the Warden of the Fleet, 2 Mod. 221. The foregoing observations apply with equal force to the case of Scriven v. Wright. 1 Bulst. 145. There, a motion was made in behalf of Scriven, that the defendant being in execution for debt. and having more liberty than was convenient for a prisoner to have, might be kept in close custody in fetters. The court refused to have the prisoner put in irons, as not warranted by any precedent, but ordered, that he should be restrained of his liberty. Yet if such liberty was an escape. the plaintiff had an adequate remedy independently of any such judicial order. The statute of 8 & 9 Wm. III. c. 27, does not appear to me to be introductive of any new law; but merely confirms the antecedent practice; and was probably intended. as well to correct other abuses, as to take away the right of the courts by summary interferences to deprive any particular prisoner of the customary indulgence. It enacts, that all prisoners in execution, &c. committed to the custody of the marshal of the king's bench, or warden of the Fleet, shall be actually detained within their prisons or the respective rules of the same; and if they, "or any other keeper or keepers of any prison," shall permit or suffer any prisoner in execution, &c. to go or be at large out of the rules of their respective prisons, except in virtue of some writ, &c. every such going or being out of the said rules shall be adjudged an escape. This act is merely in the affirmative; and if before the statute the going at large within the rules was an escape, I see nothing in the act, which takes away the common law on the subject. In truth, the statute considers the rules to all intents the same as the walls of the prison; and it does not even affect to consider any indulgence of liberty within the rules as an escape or violation of

duty. 2 Bac. Abr. "Escape," B, 1; Bonafous v. Walker, 2 Term R. 126.

It has been supposed in argument, that this statute is confined in its provisions to the king's bench and Fleet prisons; but some of its provisions apply to all prisons; and the section in question in terms extends "to any other keeper or keepers of any prison." And no case has been cited, in which a narrower construction has been supported.

The Star Chamber case remains for examination. It is no where reported at large; but the following brief minute of it is to be found in Dyer, appended by him to the case of Worlay v. Harrison, 2 Dyer, 249. I shall give it verbatim. "See well the statute of 1 Rich. II. c. 12, 'for this matter of imprisonment in execution, and how a prison and prisoner shall be ordered; and also a decree and order made in the star chamber, t. 24 Hen. VIII., by the advice of Fitz James and Norwich, chief justices of the benches, Fitzh' and Spelman, justices, that by law such prisoner shall not go at large within the prison, nor out of the prison with the warden, but shall be kept straitly in custody, &c. And an injunction thereupon given to the wardens of the prisons throughout all London to observe the said order and decree under pain of £100." Same case, cited Dalt. Sher. 140, 475. This is the whole report; and it is apparent, that it was not a decision made judicially upon a question of escape. It was merely an order and decree made by the judges with reference to the London prisoners, over which they had jurisdiction to make orders and regulations, declaring, that the prisoners shall not go at large within the prisons. It is therefore not an exposition of antecedent law, so much as a law for the future government of those particular prisons. And doubtless, it was made in the true spirit of that age and of that memorable court, signalized by its oppressions and its unrelenting severity; and in the spirit, which Lord Coke seemed zealously to cherish in better times against unfortunate debtors, consigning them to close custody in vinculis. The same case is cited in Boyton's Case, 3 Coke, 44 a, and in Rolle, Abr. 87, pl. 50; but they are mere transcripts from Dyer.

It is upon the authority of this case, or rather order of court, that the whole doctrine of constructive escapes for being at large within the prison walls has been attempted to be established. If it be considered as a positive rule of the court for the government of prisons within its jurisdiction, as upon its face it purports to be, there is certainly no objection to its legality, whatever there may be to its policy or humanity. But if it be taken as an exposition of the common law on the subject, it seems to me not entitled to any serious weight. There is no adjudged case, which supports it; and the prior as well as subsequent usages and opinions in England recognised as they are by the decisions and statute already adverted to,

pronounce an indirect judgment to the contrary. I confess, that a case from the star chamber, in times of tyranny and irresponsibility, does not come strongly recommended to my mind, especially when it savours of the infliction of punishment under the pretence of a civil remedy. I do not believe, that the common law is in this instance justly expounded; and until my judgment is better satisfied by an authority, to which I must bow, I shall continue to hold the opinion, that the safe and close custody of the common law does not prohibit the gaoler from allowing prisoners in execution for debt the liberty of all or any of the rooms within the walls of the prison. See report of a committee of the house of commons on the prisons in London, in 1814, which corroborates this view of the subject. I leave untouched, because it is unnecessary to decide in this case, the question, whether he may not also allow them at his peril and his pleasure, consistently with his duty, the liberty of the prison yard or limits. And the practice in the gaols of Rhode Island during a long period of granting such an indulgence is no mean proof of what the professional opinion upon the subject has hitherto been. Until the case of Bartlett v. Willis, 3 Mass. 86, I doubt whether a more rigid doctrine was ever supposed to exist in New England; and Clap v. Cofran, 7 Mass. 98, was the first judicial decision, in which it was held, that suffering the prisoner to be in the apartments within the prison appropriated to the gaoler was an escape. See, also, McLellan v. Dalton, 10 Mass. 190. And in that case, when again before the court, it was held by the court, that if there had been no distinct appropriation of apartments within the gaol to particular uses, it was no escape. 10 Mass. 373. This opinion must have proceeded upon the ground, which I now maintain, viz. that, suffering a prisoner to be at large within the prison walls is not per se an escape; for the apartments of the gaoler, when appropriated by law exclusively for his use, are deemed by the court to be no part of the prison. Even with these modifications the doctrine in the cases of Bartlett v. Willis, and Clap v. Cofran, were so repugnant to the general practice, as well as to legislative policy, that it is now well known that the whole doctrine was immediately abolished in respect to future cases by the legislature; and the remedy in past cases was abridged in a very summary manner. Act March 4, 1809; Act June 20, 1809; Act Feb. 28, 1811; Act June 27, 1811; Act Feb. 29, 1812. It may be added, that the decisions in Massachusetts, although they profess to receive the doctrine of the common law as to escapes, are ultimately founded on what is deemed the proper construction of the provincial and state statutes.

A different opinion as to the common law appears to prevail in New York. Liberties or limits, are there prescribed by law as appurtenances to the gaol, and prisoners in execu-

tion for debt are by statute entitled to the use of those liberties upon giving bond to commit no escape. It has been held, that by these provisions the gaols are enlarged from the four walls to the extent of the liberties; and that, as the bond is given only for the indemnity of the sheriff, he may waive that indemnity and grant the liberties without such bond. Dole v. Moulton, 2 Johns. Cas. 205; Holmes v. Lansing, 3 Johns. Cas. 73; Peters v. Henry, 6 Johns. 121. It is plainly, therefore, the doctrine of the court, that at common law granting the prisoners liberty within the prison or rules is not an escape; and indeed it has been expressly decided, that the statutes relative to gaol liberties have not altered the common law as to the liability of sheriffs for escapes. Jansen v. Hilton, 10 Johns. 549; Barry v. Mandell, 10 Johns. 563. In Connecticut the decisions are to the same purpose; for it is there held, that a gaoler may allow to a prisoner committed on civil process the enjoyment of the liberties of the prison, either on bond, or his bare promise to remain a true prisoner; and that to permit prisoners to enjoy the limits is no escape; for while they are within the limits they are to every legal intent and purpose within the prison. 1 Back. Sher. 177. I have not been able to trace any decisions in any other state affirming a more narrow rule. The late case of Houlditch v. Birch, 4 Taunt. 608, appears to me to confirm the general doctrine. There, the sheriff, instead of taking the party in execution to the common gaol, kept him for fourteen days in a lock up house kept by the sheriff for that purpose; and it was held no escape. It is well known, that these lock up houses are merely designed to secure debtors, and to leave them more at liberty than they would be in the gaol, and give them better accommodations. Yet this was thought by the court as strong close custody, as the law requires.

I have examined the cases more at large, than I should otherwise have felt necessary, because there is a diversity of opinion among American judges, as to what the common law on this subject is. I have already stated the result of my own deliberate examination; and if it differs from that of judges, for whose memories I entertain a most sincere reverence and respect, I can only regret it as the unavoidable consequence of the infirmity of human judgment. My duty is to expound the law, as it appears to my own conscience and understanding; and it is a consolation, that my opinion on this point stands approved by some of the most enlightened tribunals in our country.

If I entertained any doubts upon this point, which certainly I do not, it might be material to consider, whether the statute of 8 & 9 Wm. III. c. 27, was not adopted in Rhode Island, so far as it concerned gaolers and gaols in general, by the colonial act of 1700. If it was, then, as there is no subsequent statute, that has changed the common law

construction as to the right of gaolers to allow their prisoners the benefit of the prison limits at their discretion without giving bonds for security, it would follow, that, after the liberties were established in Rhode Island, the gaolers might have allowed their prisoners the use of those liberties, independently of the act of 1747. But it is unnecessary to dwell on this point, as I am very clear upon the general ground of the common law. I lay no stress upon the distinction in the act of 1798 between "close gaol," and the liberties of the yard, because the prisoner in this case never left the "close gaol," as contradistinguished from the liberties; and the provision of the act undoubtedly denies to principal and sureties upon escape bonds the use of those liberties; but it leaves the terms "close gaol" to be determined by their meaning at common law.

The second question, as to making the prisoner a turnkey, &c. is one of far more nicety in itself; but is in a great measure settled by authority. It is in effect, whether there can be a constructive escape in point of law, when there has been no actual escape in point of fact from the prison walls or limits. The whole doctrine of escapes rests upon the notion, that there should be an imprisonment of the party within the proper limits. There may be an imprisonment, either by physical restraint, or by superior force acting as a moral restraint upon the party. Thus a person is not less in imprisonment by being in the presence of an officer, who has arrested him, and restrains his liberty of action, than he would be by a personal detention by imposition of hands, or the application of fetters. Com. Dig. "Imprisonment," G. But in order to constitute imprisonment there must be actual or constructive custody or restraint. That a person is at liberty to go, where he pleases without any restraint, acting or ready to act upon him, either physically or morally, seems to exclude the notion of imprisonment. The law has therefore adjudged, that where a party imprisoned is allowed any liberty or authority incompatible with the notion of custody, not merely salva et arcta custodia, but of any custody at all, it shall be deemed an escape. Whether this doctrine be formed in over refinement of reasoning or not, it is not for me to inquire. It is sufficient for me, if it be so well established a doctrine, that I am not permitted judicially to deny it. Upon the ground already stated, it has been held, that if a woman is warden of the Fleet prison, and marries a person imprisoned in the Fleet, it is an escape in the woman, and the law adjudges the prisoner to be at large; for he cannot be imprisoned without a keeper, and he cannot be in the custody of his wife. Plow. 37, a; Com. Dig. "Escape," C. And see Westby's Case, 3 Coke, 71, 76. So if the warden of the Fleet, who hath an office in fee, dies seized, his son and heir being then imprisoned there, and the office descends to him, being in prison, the law adjudges

him out of prison, although he has fetters upon him, for he cannot be his own prisoner, and no man may be lawfully detained in prison without a gaoler or keeper. Plow. 37, a; Com. Dig. "Escape," C. And see Westby's Case, 3 Coke, 71, b. In like manner, if the sheriff be arrested and committed to the county gaol, it is an escape, for he cannot be imprisoned in a gaol, of which he has the custody. Day v. Brett, 6 Johns. 22; Somes v. Lenthall, Style, 465. Upon the same principle, if the gaoler himself be committed to the gaol, and the sheriff is not there, nor any other keeper appointed by him to receive and confine the prisoner, it has been held to be an escape. Colby v. Sampson, 5 Mass. 310; Gage v. Graffam, 11 Mass. 181. So it is asserted to be an escape, if the sheriff make a prisoner of the gaol keeper, and give him the keys. Id. The making a turnkey of a prisoner, so that he has the keys of the prison in his custody and lets people in and out of the prison, has been held at the common law a voluntary escape. That was the case in Wilkinson v. Salter, Cas. t. Hardw. 310; for although there was an actual escape without the prison in that case, yet there had been a recaption and return, which would have been a good defence, if the escape had been merely negligent. But Lord Hardwicke held it a voluntary escape, because the prisoner was entrusted with the keys of the prison, so that he might go out when he would. The case does not point exactly to the present question, but it affords a strong presumption, that the mere fact of making the party a turnkey, and trusting him with the keys, is per se a constructive escape. But supposing the case doubtful, it appears to me, that such, by the just analogy of the law, is the legal inference. When a prisoner, as in the case now before me, is permitted to act, not merely as a turnkey, but to have the possession and custody of the keys and all the doors, as well when the gaoler is abroad as at home; and to perform all the duties of an assistant, without any restraint whatsoever as to his person either by day or night, he cannot be justly deemed in any proper sense of the law to be in custody, much less in safe and close custody. The gaoler allows him for the time the complete command of the gaol; and I cannot distinguish his case in principle from those, which have been already stated. It is not the mere absence of physical restraint that makes it an escape, but it is that com bined with the voluntary yielding up the right of future custody, so that there can be no recaption, if the prisoner leaves the limits. And such is manifestly the construction, which the law puts on the act, for upon such voluntary escape the gaoler loses all right of future imprisonment of the party. I do not rely upon the fact, that the outer door was ordinarily left open in the day time, as an abandonment of custody; but it is certainly a very strong circumstance to show the extreme negligence of the keeper as to prisoners, who had not given bonds.

The remaining point, as to the effect of the commitment of the gaoler himself during the period of the prisoner's confinement, may be disposed of in a few words. That commitment, without any new keeper being appointed by the sheriff, was clearly upon authority an escape of the gaoler himself, for which the sheriff would have been liable. But it was not an escape of the other prisoners, if in point of fact they were kept in custody; for although a man may not imprison himself, being gaoler, he may hold others in prison, and he may act as gaoler for the sheriff over others, even when he is himself committed to the gaol as a prisoner. It is sufficient in such cases, if there be a virtual custody by some person having authority from the sheriff, which as to all other persons the gaoler in such cases has. Nor is there any thing in the authorities cited at the bar, which, properly considered, contradicts this. The case of Somes v. Lenthall, Style, 465, was an application to the king's bench to commit the defendant, then the marshal of the king's bench prison, and the court refused it, giving as a reason, "we can commit him to no other prison but the Marshalsea, for that is the prison of this court; and to commit him to that prison, of which he is the keeper, without securing the prisoners there, before we do it, will be an escape in law of all the prisoners." And the same doctrine was held in Bendison v. Lenthall, 1 Keble, 202. See also 2 Bac. Abr. "Escape," B. 3. This doctrine at most establishes no more than, that if the sheriff himself is in actual custody under an order of court, so that he cannot guard his prisoners, he virtually leaves the prison without any keeper. But if his under keeper only is committed, and his other prisoners are in fact securely kept, there seems no reason to hold it a constructive escape of such prisoners; for the under keeper is in contemplation of law at large, and if permitted to be so in fact, he may well be a keeper of the other prisoners. If the law were otherwise, it would follow, that if the sheriff were to make a prisoner his turnkey, it would be an escape of all his other prisoners, which has not been pretended. In truth, the authority of an under keeper over other prisoners is not determined by the mere fact of his own commitment, that commitment being in point of law only for an instant.

I have finished all, that I have thought it necessary to say upon this case; and am of opinion upon the whole, that the action is well brought, and that the conduct of the gaoler in making the prisoner an assistant turnkey, and allowing him at all times the control of the keys of the outer and inner doors of the gaol, and an unlimited liberty throughout all the apartments, constitutes a constructive escape, for which the defendant is liable; and that therefore judgment ought to be rendered on the verdict for the plaintiff.