## CHARLES J. LUTHARDT *v.* STATE OF MARYLAND

[No. 194, September Term, 1968.]

*Decided March 10, 1969.*

*William H. Zinman* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Howard L. Cardin, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

Murphy, C.J., delivered the opinion of the Court.

Appellant Luthardt was charged in the Criminal Court of Baltimore with "acting in a disorderly manner, to the disturbance of the public peace, in and upon 800 block of Glade Court" on September 6, 1967, in violation of Maryland Code, Art. 27, § 123.[1] He was subsequently convicted by the court sitting without a jury, assessed a fine of $50.00, and sentenced to thirty days in jail, the jail term being suspended upon condition of good behavior for the probationary period of two years. On this appeal Luthardt contends (a) that Art. 27, § 123 is unconstitutional both on its face and as applied to his conduct under the facts of this case, and (b) that the evidence was not legally sufficient to support his conviction under the statute.

The record discloses that appellant was arrested following a "demonstration" which had been directed against a Negro family residing at 822 Glade Court, in a predominantly white neighborhood—the demonstration having apparently been touched off by the alleged stabbing of a white boy by one of the children of the Negro family. The evidence indicated that "demonstrations"

---

1. This section, in effect at the time of the crime, provided, insofar as pertinent, that "Every person who shall be * * * acting in a disorderly manner to the disturbance of the public peace, upon any public street or highway, in any city, * * * in this State, * * * shall be deemed guilty of a misdemeanor * * *."

254

had been conducted at this location for the three nights immediately preceding appellant's arrest, that vehicular traffic had been closed in the area because of the demonstrations, and that a large contingent of police had been assigned to keep peace and order in the affected neighborhood.

Sergeant Richard Francis testified that he was a member of the police tactical force, whose function it was to control crowds and demonstrations; that at about 8:30 p.m. on September 6, 1967, he observed that a crowd of 400 to 450 white persons had gathered in the 800 block of Glade Court; that on one side of the block were residences, in front of which were 20 to 25 men and boys marching up and down, at times in single and, at other times, in double file; that the bulk of the crowd was standing across the street on a hill behind a fence; that the marchers were being led by codefendants Zill and Richter, both of whom were dressed in the regalia of the Ku Klux Klan and that appellant was in front of the marchers with them; that some of the marchers (apparently referring to the Negro family) yelled, "Burn them out", and "Run them out of the neighborhood", and "White man, fight"; that members of the crowd on the hill were only about forty feet from the marchers and they also were hollering and throwing bottles and rocks; and that as some members of the crowd on the hill attempted to climb over the fence, it was necessary to position a cordon of police officers on the hill to restrain them. Francis further testified that the crowd was excited, and that after the march had lasted from fifteen to twenty-five minutes, the order was given to the marchers by the police for them to disperse and that those who did not leave, including appellant, were then arrested.

Colonel Frank Battaglia, Chief of the Patrol Division, testified that at 7:00 p.m. on September 6, he observed that a large crowd had gathered in the 4100 block of Tenth Street and in the 800 block of Glade Court; and that at approximately 7:30 p.m., he observed appellant in the area driving his automobile east on Tenth Street and that his passenger Zill was exhorting the people over a loudspeaker to:

> "Burn out the savages. You had a stabbing here recently. Burn them out. White man, fight. Tomorrow may be too late."

In response to these exhortations, the crowd cheered, "Hooray, let's get them."

Battaglia further testified that when he arrived in the 800 block of Glade Court at 8:00 p.m., he saw appellant Luthardt there and also observed bottles and bricks being thrown (some of which were thrown at the Negroes' home); that he observed men in the robes of the Ku Klux Klan and heard some of the marchers shouting and chanting "Burn them out" and "Get rid of the Negroes". Battaglia also observed several members of CORE standing in front of 822 Glade Court "and they were exchanging blasts at one another, the crowds, the people that were marching, and I went over to CORE and asked them to leave, to go into the house," and they complied with the request. He then turned to the marchers, who, at that time, were saying such things as "Black M.F.'s" and "No good s.b." Battaglia displayed his badge, identified himself and "about three times" informed the marchers that if they did not discontinue marching they would be subject to arrest. About fifteen marchers, including appellant after he had "left the line", were arrested.

Wade Poole, Deputy Commissioner of Police, testified that he had deployed about 200 police officers in the area; that he observed approximately 100 members of the crowd marching in the street near the Negroes' home; that the CORE members were calling the crowd "white trash", while the crowd responded by shouting "The only good nigger is a dead nigger." Poole testified that the marchers were saying, " 'White man, fight,' and raising their arms in that method, and every time they would do that, the crowd would shout again." Poole testified that he was "fearful when the arrests were made, the crowd would charge down into it," and that the main object of the police was to keep the crowd on the hill from "rushing down".

Police Officer Michael Pucci testified that he was assigned to the Glade Court area during the evening of September 6, and observed the appellant "marching with the Klan", and that when the arrests were ordered, "I noticed Mr. Luthardt disappear * * * [and] when I again saw Mr. Luthardt, he was up on the hill, approximately seventy-five feet from where I was standing and * * * I went up there, placed him under arrest." On cross-examination Officer Pucci was asked whether appellant

was in the marching line when the arrest order was given, and he replied, "Yes, Sir, I saw him in the line."

Appellant testified in his own behalf and denied that he participated in the march. He stated that he had gone to the head of the marching formation and given Zill American flags, declining, however, to march because he had been informed by Deputy Police Commissioner Poole earlier in the day that if he did he "would be locked up". He testified that he used no obscene language and did not engage in any shouting. After he had handed out the flags and the march began, he went "up on the hill".

On cross-examination, the court made inquiry of appellant as follows:

"Q. What was being said over the speaker system have anything to do with the demonstration or marching to take place in that block of Glade Court?

"A. Mr. Zill was pleading with the people to come over to the demonstration and lend their support to it. This talk about 'Let's burn them out.' I think this is utterly ridiculous to attempt to label us and prevent us from expressing our opinion. * * *."

Counsel questioned appellant further, as follows:

"Q. What did you expect to happen from the marching and demonstration?

"A. Expected to happen what's been happening in the past four years. People would congregate, express themselves by being present and go peacefully home.

* * *

"Q. Am I to assume one of the purposes of the marching and the demonstrating in this block was to inform the people, or so you say, of the danger and get them to do something about it?

"A. Yes, Sir."

I

In *Bacheller v. State,* 3 Md. App. 626, we held in effect that Section 123 was not unconstitutionally vague, indefinite, nor

overbroad. Appellant's contention that the statute is unconstitutional for these reasons is therefore without merit. In addition, the question of the constitutionality of Section 123 was not properly preserved for appeal by objection in the lower court and is therefore not before us for consideration. *Woodell v. State*, 2 Md. App. 433. Maryland Rule 1085.

## II

Nor do we find merit in appellant's contention that as applied to his conduct, Section 123 violated his First and Fourteenth Amendment rights. The basis of his contention appears to be that even if he was a participant in the march in its initial stages, no clear and present danger existed sufficient to justify the termination of the march by the police and the arrest of the marchers for disorderly conduct under the statute. Appellant urges that the marchers were protected by the First and Fourteenth Amendments since they conducted their march in an orderly manner in the presence of the police, who had absolute control over the demonstration and who in fact had been given advance notice that the march would be held. Appellant states that no inflammatory speeches were made at or during the march, that the public arousal generated by the demonstration can in no event defeat the exercise of First Amendment rights, and as the order to disperse was unconstitutional, failure to obey such a police command would not constitute disorderly conduct. As to his own participation in the march, appellant maintains that there was no evidence that he did or said anything sufficient to justify the application of Section 123 to his conduct, particularly since he promptly left the line of marchers and went up on the hill when the police order to the marchers to disperse was given.

We think it plain that it is not an abridgment of the constitutional right of free speech to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language. *Cox v. Louisiana*, 379 U. S. 536, 555; *Giboney v. Empire Storage & Ice Co.*, 336 U. S. 490, 502. It is the substance rather than the form of communication to which the First Amendment protection attaches, and regulation of the form is constitutional where it arises from a legiti-

mate State interest and not for the sole purpose of censoring the underlying thought or idea. *Bacheller v. State, supra,* at page 636, and cases there cited. The State may, therefore, prevent and punish some classes of speech, among which are "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace [since] such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire,* 315 U. S. 568, at page 572. See also *Cantwell v. Connecticut,* 310 U. S. 296, at page 308, to the effect that the right of free speech does not sanction incitement to riot or the right to exhort others to physical attack upon those belonging to another sect. And as we recognized in *Lynch v. State,* 2 Md. App. 546, 557, the resort to epithets or personal abuse is not in any sense communication of information or opinion safeguarded by the Constitution. See also *Feiner v. New York,* 340 U. S. 315; *Terminiello v. Chicago,* 337 U. S. 1.

It is clear from the record before us that the demonstrations in Glade Court were calculated to stimulate and provoke interracial disorder—indeed such a conclusion is inescapable from the evidence. For three consecutive nights immediately preceding the night of September 6, demonstrations had been conducted against the Negro family and just before the march on September 6, the crowd in the immediate area was implored by a loudspeaker installed in appellant's vehicle to "burn out" the Negro family—that "tomorrow may be too late". It was against this background that the white crowd, 400 to 450 strong, again assembled before the home of the Negro family, threw rocks and bottles, shouted racial epithets and were then and there exhorted by the marchers, some of whom were dressed in the provocative garb of the Ku Klux Klan, to "fight", to run the Negro family out of the neighborhood—to burn them out. That the mob erupted under such prodding and attempted to break through police lines was by no means an unforeseeable consequence, and those who provoked and produced the conflict can no more disassociate their conduct with its occurrence

than they could find a proper constitutional basis upon which to prohibit the action of the police in restraining the mob and dispersing the marchers.

That an interracial confrontation so staged does not represent an orderly expression of ideas protected by the First Amendment is, we think, too clear to require extended discussion. See *Lynch v. State, supra.* We hold that such a course of conduct as was initiated and pursued by the marchers can find no sanctuary in the free speech provisions of the Federal Constitution, but on the contrary falls squarely within the ambit of *Chaplinsky* and *Cantwell* and, as such, runs counter to the underlying rationale of those cases, *viz.,* that the constitutional right of free speech does not encompass the right to exhort others, either by verbal or nonverbal means, to physical attack upon other persons, particularly those belonging to another race.

In *Drews v. State,* 224 Md. 186, 192, it was held that the gist of the crime of disorderly conduct under Section 123 "is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area"; that it is conduct "of such a nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby." It was also recognized in *Drews* that the failure to obey a policeman's command to move on when not to do so may endanger the public peace amounts to disorderly conduct. To apply the provisions of Section 123 to such a course of conduct as was involved in the present case is well within constitutional boundaries, the only inquiry of substance being whether the appellant, by what he did and/or by what he said, can constitutionally be convicted of violating the provisions of the statute.

While appellant was charged with acting in a disorderly manner to the disturbance of the public peace in and upon the 800 block of Glade Court on September 6, 1967, we believe it permissible in determining the question of his guilt of such offense to consider, as proper and relevant background, the events leading up to his presence at the scene of the demonstrations. See *Bacheller v. State, supra,* at page 638. As heretofore indicated, just prior to appellant's involvement with the marchers in Glade Court on the night of his arrest, he and Zill, one of the leaders

of the march, exhorted the crowd by means of a loudspeaker installed in his vehicle to attend the "rally" and "burn out the savages" because "tomorrow may be too late". Under these circumstances, we think that appellant's subsequent presence among the marchers in Glade Court established not only his identity with their announced objectives, but also the fact of his voluntary involvement with their disorderly activities. Merely because there was no evidence that appellant personally muttered any obscenities, shouted any insulting epithets, or uttered any "fighting" words during his participation in the march, does not insulate him from a conviction for disorderly conduct, where, as here, the record so clearly discloses that he was an integral part of a disorderly group of persons espousing racial hatred and counselling violent action. Nor can appellant claim immunity from arrest and conviction for this offense simply because he, unlike some of his confederates, may have promptly obeyed the police order to the marchers to disperse. And neither can appellant divorce himself from the disorderly setting which he personally did so much to contrive simply because he left the line of marchers and made it to the top of the hill before he was arrested. We hold that appellant's conduct on the night of his arrest in the 800 block of Glade Court, as reflected by the record, was not constitutionally protected and that his conviction of disorderly conduct under Section 123, as construed by *Drews,* was not clearly erroneous. See Maryland Rule 1086.

*Judgment affirmed.*