RICHARD O. BAUMGARTNER *v.* STATE OF
MARYLAND

[No. 544, September Term, 1973.]

*Decided May 20, 1974.*

The cause was argued before THOMPSON, DAVIDSON and LOWE, JJ.

*Robert C. Heeney* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Robert S. Rothenhoefer, State's Attorney for Frederick County,* and *Peter I. J. Davis, Special Attorney,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Richard O. Baumgartner is the Sheriff of Frederick County. On July 6, 1973 he was convicted by a jury in the Circuit Court for Montgomery County of false pretenses, embezzlement and malfeasance in office. Judge Joseph M. Mathias imposed two concurrent two-year sentences for false pretenses and embezzlement and a sentence of twenty-five days in jail or a fine of $250 for malfeasance in office. The sentences for false pretenses and embezzlement

were suspended upon eighteen months probation and restitution of funds to the County.

Appellant submits eight assignments of error. The first two are interrelated and will be treated together, as will the third, fourth and sixth for the same reason.

## I and II

## JOINDER OF OFFENSES

"The trial judge abused his discretion in refusing to order an election or separate trial of the alleged offenses."

"The joinder and trial of 32 counts in this case prejudiced and improperly limited the appellant's Constitutional Rights."

The grand jury presentment contained thirty-two counts charging Sheriff Baumgartner with offenses committed from the time he took office in December, 1970 until June of 1972. Judge Mathias denied a defense motion for an order requiring separate trials of the various counts or an election among them by the prosecution. During trial, Judge Mathias granted a motion for judgment of acquittal as to fourteen counts. The jury acquitted appellant of fifteen others and convicted him of three.

Appellant contends that the court abused its discretion in refusing to order separate trials as to all counts or to compel the State to elect among them. The gist of appellant's argument appears to be that it is never proper to permit the joinder of offenses unless all of the offenses involve substantially the same facts, form part of the same transaction, and occur during a brief space of time.

Md. Rule 716 a permits the joinder of two or more offenses in one indictment. To protect the legitimate interests of both sides, however, Md. Rule 735 provides that the court " . . . may order an election or separate trials of counts . . . or provide such other relief justice requires." Whether or not to order separate trials is a matter within the sound discretion of the trial court. *Jennings v. State*, 8 Md. App. 312, 315.

In his June 21, 1973 Memorandum Opinion and Order refusing to order separate trials, or a prosecutorial election, Judge Mathias found that the defendant would not be prejudiced by a joint trial, whereas it "would impose an unconscionable burden on the State and result in an unnecessary expenditure of money to try the defendant separately on these counts." He ruled that the defendant would not be prejudiced because all the offenses charged were similar or related and all grew out of the defendant's conduct as Sheriff of Frederick County. We find no abuse of discretion in this ruling.

The thirty-two counts of the presentment charged Sheriff Baumgartner with a series of acts, dating from his assumption of office, which taken together showed a common design to defraud the County or certain individuals of money, services, or property and in so doing to misuse the trust reposed in him by reason of his office. He was accused of defrauding the Frederick County Commissioners between December, 1970 and June, 1972 by 1) misrepresenting personal telephone calls as official calls (Count 1); 2) purchasing beef steaks charged to the jail, but submitting bills indicating the purchase of stewing beef (Counts 2, 3, 4, 26, 27); 3) working, and assigning his deputies to work, during normal hours for private concerns for compensation, while submitting regular forty-hour and overtime pay vouchers (Counts 5, 6, 7, 8, 9, 10, 11, 12, 28, 29, 30, 31); 4) selling goods charged to the County to his deputies and one other individual, but failing to turn over the proceeds of these sales to the County (Counts 13, 14, 15); and 5) receiving compensation for transporting uniforms from Harrisburg, Pennsylvania to Frederick County in his official vehicle but failing to account for or turn over these monies to the County (Counts 16, 32). He was also charged with embezzling funds belonging to five individuals which he obtained at sheriff's sales for which he collected unauthorized auction fees (Counts 17, 18, 19, 20, 21, 23, 24, 25). Finally he was charged with permitting a prisoner to leave his custody without supervision for the purpose, among others, of painting the Sheriff's house for which work the prisoner received no compensation. All but six charges

accuse the defendant of embezzling or obtaining funds by false pretenses from the same victim, the Frederick County Commissioners. Five of the remaining counts charge him with embezzlement by withholding from five individuals funds belonging to them which came into his possession by reason of his office. The final count alleges similar misconduct in permitting a prisoner to leave custody to work without compensation resulting in private gain to the Sheriff.

The appellant errs in contending that the court must require separate trials or elect among counts where the accusations do not arise from the same transaction. In *Simmons v. State*, 165 Md. 155, the Court of Appeals approved the joinder of eighteen counts charging the defendant with larceny or obtaining funds by false pretenses from a bank in separate transactions over a nine-month period.

It is also not necessary that all the offenses charged be committed against the same victim. In *Jennings v. State, supra*, this Court upheld the joinder of counts charging the defendant with the burglary of a dwelling and the breaking of a storehouse belonging to different individuals.

In determining whether a defendant will be prejudiced by the joint trial of several counts, "[t]here is no rigid rule, and the only limitation is that courts will guard against injustice." *Wanzer v. State*, 202 Md. 601, 608.[1] In the instant case, we agree with Judge Mathias that the defendant did not risk prejudice in the joint trial of all the charges against him. We believe that all of the offenses charged were of the same general nature, formed part of a general scheme of unlawful conduct and permitted the same mode of trial. Since the proof tending to show each one of the offenses charged showed a common scheme to appropriate public funds or services for personal gain, the proof of any one offense would be admissible in proving any other. Cf., *Jennings v. State, supra*, 316. Judge Mathias' refusal to

---

1. In Jennings v. State, *supra*, 315, we noted that "Rule 735 conforms in substance with the common law rule discussed and applied in *Wanzer*." *See also* DiNatale v. State, 8 Md. App. 455, 458.

order separate trials or an election by the State was neither an abuse of discretion nor a denial of appellant's constitutional rights.

## III, IV and VI

### EXCLUSION OF EVIDENCE — INSTRUCTIONS REGARDING DUTIES OF SHERIFFS — CONSTITUTIONALITY OF "SAFELY KEEP"

"The trial judge was in error in excluding evidence of the customs of the Sheriffs of other Maryland counties."

"The instructions of the trial judge as to the customs and duties of a Maryland Sheriff were in error."

"Article 87, Section 45 of the Maryland Annotated Code is unconstitutionally vague."

The twenty-second count of the grand jury's presentment charged Sheriff Baumgartner with malfeasance in office for permitting a prisoner to leave the jail unescorted and unsupervised during the two and a half month period he was awaiting sentence after pleading guilty to manslaughter. The appellant allowed the prisoner to leave the jail unsupervised, usually to work outside the jail but also to visit his parents at their home on at least three occasions. Lewis testified that he worked " . . . outside the jail . . . and washed cars and everything, mowed the grass." Lewis also testified that he had gone to the Sheriff's home while a prisoner and "done caulking work for him . . . built cellar doors, put on some stuff and painted." Under cross-examination, he recalled doing panelling in the court house and moving books in the library. The prisoner always returned when expected and was present in court whenever required.

### Exclusion of Evidence

During trial, appellant proffered the testimony of sheriffs of other Maryland Counties as to their permitting trusted

prisoners to work outside and unguarded. The court sustained an objection to that proffer saying:

" . . . These men [sheriffs] are in different counties. The conditions are different.

"It does seem to me that it is the wrong kind of evidence to help the jury decide whether or not the Sheriff of Frederick County in a careful and prudent manner performed his duties in a careful and prudent manner and discharge of his obligations as Sheriff."

Appellant responded that the evidence proffered was relevant to the jury's understanding of Md. Code, Art. 87, § 45 which provides that "The sheriff shall safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law."

The sheriffs whose testimony was proffered were from Allegany, Kent, Somerset and Washington Counties. The proffer was that these sheriffs would testify that it was their custom to allow prisoners awaiting trial to work in the Court House without supervision. Appellant argued that this practice was in accordance with a prisoner's " . . . commitment . . . it says keep them and deliver them." [2]

We fail to see the relevance of this proffer for, as noted by the judge, "The conditions are different." The proffer explicitly referred to prisoners in the other counties who were awaiting trial. Obviously, under such circumstances, the sheriff is bound by the explicit orders of the prisoner's commitment. The question before the court did not relate to a prisoner awaiting trial, but rather to one convicted upon his plea and awaiting sentence.

---

2. Appellant was apparently referring to a Bench warrant since the customary "Commitment Awaiting Further Action" issued after a preliminary hearing instructs the sheriff to "safely keep *in your jail* and custody until he shall thence be delivered according to law." (Emphasis added.) A Bench Warrant on the other hand, usually issued after indictment by a grand jury commands the sheriff to take the offender "if he shall be found in your bailiwick, so that you have [his] bod[y] before the Circuit Court of . . . . . . . . . . . . . . . . . County, immediately, to answer unto the State . . . ."

The indictment charged:

" . . . during the period *between October 13, 1971 and December 22, 1971* . . . Richard O. Baumgartner, unlawfully and wilfully did permit one Richard Eugene Lewis, *a convicted felon*, to leave the jail unescorted and unsupervised contrary to his duty . . . ." (Emphasis added.)

The docket entries relating to Richard Lewis indicate the court accepted his plea of guilty to Manslaughter on October 5, 1971 and that he was " . . . remanded to the custody of the Frederick County authorities pending sentencing." He was not sentenced until December 22, 1971. As a consequence, the proffered testimony of other sheriffs' practices relating to prisoners under commitment awaiting trial was not relevant to the issue of a prisoner held after conviction. The test of admissibility is the connection of the fact to be proved with the offense charged. *Wilson v. State*, 8 Md. App. 653. The trial judge who "is clothed with broad discretion in determining what evidence is relevant . . ." could see no relevant connection, nor can we. See 1 Wharton, *Criminal Evidence*, § 151.

Beyond that, the custodial practices in the several counties differ markedly by virtue of local legislation enacted by the General Assembly. Frederick County itself has a unique directive to the Sheriff regarding the employment of prisoners who have been convicted and sentenced. Three of the four counties included in the proffer have variants of that local legislation while the fourth is silent. Notwithstanding the fact that sheriffs are state not county officers, see *Talbot County v. Carroll*, 172 Md. 386, 387, their respective duties do vary from county to county in accordance with such local statutory directives. The proffer contained no assurance that the county practices were governed by the same statutes or statutes similar to those directing the Frederick County Sheriff.

The evidentiary question decided by the judge was whether the proffered evidence tended to prove or disprove the crime charged. *Baxter v. State*, 223 Md. 495. Without the

foundation of similarity of authorized practices the evidence could very well have been misleading rather than enlightening. "No precise and universal test of relevancy of evidence is furnished by law but the determination of whether or not particular evidence is relevant rests largely in the discretion of the trial court, which must be exercised according to the teachings of reason and judicial experience." 31A C.J.S. *Evidence*, § 158. We see no abuse of that discretion.

## The Instruction

At the conclusion of the case, the court instructed the jury that a sheriff is a constitutional officer who shall exercise such powers and duties as are now or may hereafter be fixed by law. The judge then stated that the Legislature had enacted Md. Code, Art. 87, § 45 pursuant to th constitutional provision. After reading Section 45:

"The sheriff shall safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law,"

he added;

"It has long been established that the place where persons shall be kept is in jail and that the care and control of persons, confined in the jail is the responsibility of the Sheriff unless changed by the Legislature. The Sheriff owes a duty to the public to safely keep the prisoners who are committed to his custody."

Appellant argues that, since the term "safely keep" in Art. 87, § 45 is not defined in that Section of the Code or in any other, the court's instructions regarding the proper place for keeping prisoners misstated the law. We do not agree.

Even at common law it was a misdemeanor for a sheriff or jailor having lawful custody of a prisoner voluntarily or negligently to permit him to depart from the custody, no

matter how short a time the departure might be. *Ex parte Shores*, 195 F. Rep. 627, 630 (D.C. N.D. Iowa), citing 4 Blackstone, *Commentaries*, 129-130; see also Perkins, *Criminal Law* (2nd. Ed.), Ch. 5, pp. 500-501. Moreover, the principal case interpreting what is now § 45 of Art. 87, *Cocking v. Wade*, 87 Md. 529, explicitly contradicts appellant's assertion. In *Cocking v. Wade, supra,* a mob took an accused murderer from a jail by force and lynched him. The prisoner's heirs sued the sheriff for negligently failing to move the prisoner to safety when warned of the existence of public excitement about the prisoner.

In interpreting the meaning of "safely keep" used in Art. 87, § 45 (then § 43), the court said that the place prisoners were to be kept was in jail — precisely where the decedent had been placed by the sheriff until he was removed by the lynch mob. As a consequence, the court held the sheriff had not violated the standards of protection expected of him. Although this case interpreted the statute as it related to the safety of the prisoner, the court, in defining the sheriff's duty, made it abundantly clear that for his failure to perform this or any other duty "... he was liable to be proceeded against criminally. His duty to keep safe the prisoner was not for the benefit of the prisoner; it was that he might be detained until discharged in due course of law ...." The court's reasoning was confined to one paragraph:

> "From a very early day the English law has contained provisions defining and regulating the rights and obligations of sheriffs in respect to the custody of persons charged with the commission of crime. As far back as the Statute of 14 Edward III, ch. 10, the right to the custody of the gaols was 'rejoined' to the sheriffs of the bailiwicks; and by the 5 Hen. IV, it was ordained, that none be imprisoned by any justice of the peace, 'but in the common gaol.' In our own State, by statute passed in 1809, and now codified as section 16 of Article 42, no citizen committed to the custody of an officer for

a criminal matter shall be removed from thence into the custody of another officer, unless by *habeas corpus* or other legal writ, except when the prisoner is delivered to a constable, or other inferior officer to be carried to some jail, or shall be removed from one place to another * * in order to his discharge or trial; or in case of sudden fire or infection, or other necessity, or, '&c. Mr. Alexander in his valuable work on the 'British Statutes,' remarks of this section that it is 'intended to prevent the vexation and danger of protracted imprisonment which might be occasioned by the removal of the prisoner from one custody to another. And it affirms therefore the principle that the prisoner ought to be committed to the proper prison in the first instance.' This observation is supported by a fair interpretation of sections 43, 44 and 45 of Article 87 of the Code. The first of these sections provides that the sheriff shall 'Safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law;' and the place where he shall so 'keep' them, is clearly indicated by the 45th section. That section provides that all persons committed under the authority of the United States, the sheriff shall receive and safely keep in jail, 'in the same manner and under like penalties as if such persons were committed under the authority of this State.' " *Cocking v. Wade, supra*, 539-540.

We fully recognize the steps taken by the General Assembly toward implementing the modern view that gainful employment of prisoners better serves society and prisoners than "warehousing" them in jails and prisons. The Legislature has provided for statewide work programs by authorizing the Department of Corrections to establish a "work release program," Md. Code, Art. 27, § 700A, and by permitting courts to prescribe conditions of employment in sentencing prisoners supervised by sheriffs or the

Department of Parole and Probation. Md. Code, Art. 27, § 645K, et seq. The counties themselves have been used for experimental purposes in this area. A pointed example is Sec. 5-5 of the Frederick County Code, referred to above:

"Sec. 5-5. Working of prisoners on public roads, etc. The sheriff of the county is hereby authorized and directed to require all persons of sufficient ability who shall be sentenced to imprisonment in the county jail by any court or justice of the peace of the county as a punishment for any crime or misdemeanor committed therein to work upon the public road, highways, buildings and properties or to do some work in connection with the improvement thereof, as part of the prison discipline and management; provided, the work is for the public and not private benefit. The sentence of every such person shall be reduced by one day for every five working days spent in such work. Laws of 1961, ch. 687, § 1." (This section was amended technically by Laws of 1974, Ch. 275 without change of substance.)

This section not only authorizes but directs the sheriff to see that all able-bodied prisoners work on County projects. To do so obviously necessitates their release from absolute confinement. The act is silent, however, as to what if any supervision is needed or should be provided. However, the act is not decisive of the case at hand because it is applicable solely to those persons who have been sentenced. Richard Lewis had been convicted under his plea but had not yet been sentenced during the period in which the Sheriff was charged with permitting him unsupervised freedom. Although the testimony was most unclear as to Lewis' status between October 13, 1971 and December 22, 1971, the docket entries of the Lewis case, introduced as a State exhibit, show that Lewis' unsupervised departures from jail occurred before "sentencing." Thus, unless the mittimus of the court is to the contrary, *Cocking v. Wade, supra,* indicates that a sheriff has no discretion in releasing a prisoner "unless some necessity

makes it proper to remove him . . . ." Only a court order or a statute can relieve a sheriff of his responsibility to keep prisoners committed to his charge in *arcta et salva custodia,* strict and safe keeping — or, as interpreted in *Steere v. Field,* 22 F. Cas. 1210, 1218 (No. 13, 350) (C.C. R.I.), "strict confinement under lock and key."

## Constitutionality

Appellant contends that the words "safely keep" in Md. Code, Art. 87, § 45 are so vague, indefinite and ambiguous that "Sheriffs of ordinary intelligence must necessarily guess at their meaning and differ as to their application." The record does not indicate that the trial judge actually considered that constitutional challenge, which was not raised until Appellant's case was closed and his Motion for Judgment of Acquittal denied.

In declining to respond to this constitutional question not adequately heard nor decided below we repeat what we said in *Vuitch v. State,* 10 Md. App. 389, 397-398:

"In concluding that the constitutional questions now sought to be raised were not properly preserved for appellate review, we do not seek to delay the day when these important public issues must be squarely met and decided, either by us, or the Court of Appeals of Maryland. But it would be fool-hardy in the extreme to undertake the resolution of such complex constitutional questions upon a record as procedurally and substantively deficient as that now before us — one in which the constitutional questions, though readily apparent prior to trial, were raised for the first time after the State had concluded its case-in-chief, and then only by an inappropriate motion (generally alleging unconstitutionality along a front far more limited in thrust than that presently sought to be aired), submitted without comment, or illuminating argument. Whether the trial judge actually considered appellant's constitutional claims cannot

be ascertained from the record since in denying the motion he made no comment thereon, and may well have concluded, quite properly, that the constitutional questions could not be raised at that juncture of the proceedings by motion for judgment of acquittal. Of course, nothing is better settled than the rule that a question as to the constitutionality of a statute will not be considered on appeal when not properly raised and decided by the lower court. *Luthardt v. State,* 6 Md. App. 251; *Iozzi v. State,* 5 Md. App. 415; *Woodell v. State,* 2 Md. App. 433." See also *Hallengren v. State,* 14 Md. App. 43, 47.

## V

## Office Records

"The production and use of the Sheriff's personal records was a violation of his Constitutional Rights."

Appellant kept daily work release logs for prisoners and time sheets for jail personnel. He argues that " . . . no statute required the keeping of those papers . . . [and that] appellant kept the same at his own time and expense. Thus the papers were purely private." He contends that the Court " . . . ordered their production based upon . . . Md. Code, Art. 76A, Section 1, the Public Information Statute . . . [and] the Court also based their admission into evidence upon this section of the Code." He then argues that even if the records are found to be public his Constitutional rights against self-incrimination, under the Fifth Amendment to the Constitution of the United States and Article 22 of the Declaration of Rights of the Maryland Constitution, were violated. In light of the circumstances, it is difficult to follow appellant's reasoning.

On the third day of the trial, the State filed a subpoena duces tecum for the records. They were produced in the court room over objection. It appears that at least part of

those voluminous "jail records" were *marked for identification* for the State but never introduced into evidence as a State's exhibit. The entire box of records was later introduced *by appellant* as Defendant's Exhibit No. 4. Although it is unclear what portions of the records appellant claims constituted a violation of his right against self-incrimination, it is distinctly clear that such right does not apply to evidence which appellant introduced. Quite obviously the production of the documents did not prejudice appellant. If anything did, it was their availability to the jury after introduction as evidence. Any objection to the production of the documents was waived by appellant's introduction of the records into evidence as his own exhibits.

## VII

"The Court created reversible error in refusing defense counsel's request to submit written instructions to the jury."

Pursuant to Md. Rule 756 b, the trial judge elected to give written instructions to the jury after reading them in open court. Appellant advised the court that he had no request for instructions by the court, but that he "would do his own instructing." He requested the right to submit his own instructions to the jury in writing. The court denied his request. Appellant now complains that the denial gives the court's instructions "the force of law" and that such action was "error and prejudice" which "improperly influenced the decision."

Md. Rule 756 a and b contain the answer to appellant's assignment of error. Rule 756 b authorizes the court to "give its instructions either orally or in writing;" it does not give the parties the same right. Nor do we know of any statutory or judicial authority which does so. Rule 756 a does give appellant the right to "file with the court written requests that the court instruct the jury as set forth in such requests. . . ." Appellant declined that opportunity and decided to "do his own instructing." This of course is his

prerogative. He is not denied the right to argue to the contrary and to express his own views of the applicable law. Md. Rule 756 e; *Wilson v. State*, 239 Md. 245, 256-257. Any differences between court and counsel as to the law are to be resolved by the jury. *Schanker v. State*, 208 Md. 15, 21, quoted with approval in *Wilson v. State, supra.* Under Md. Rule 756 f appellant may object to any instruction by the judge which he believes improperly states the law, and he may argue contrary to the court's proper instruction of the applicable law. Even in this instance the judge must advise the jury, as he did here, that "In this State the jury is the judge of both the law and the facts. Therefore, my instructions to you are advisory only and not binding upon you." Md. Rule 756 b.

Appellant's argument that the judge's instructions would have the "force of law" apparently is intended to mean they will be given more weight by virtue of their relative permanence and availability during the jury's deliberations.[3] The argument issues from an erroneous, unspoken but necessary corollary, *i.e.*, that the judge is an advocate rather than an arbiter. To the contrary, such procedural discretion is permitted him because of his impartiality, and denied the parties because of their adversary roles.

Appellant is not prejudiced if the judicial instructions are a correct statement of the applicable law. If they are incorrect Rule 756 f permits review and correction of the erroneous instruction properly objected to. That additional weight may be given judicial instructions by the jury over those of an advocate is a derivative of the protective coloration of judicial impartiality. We see no prejudice by virtue of the procedure elected by the trial judge and authorized by rule.

## VIII

"Under the totality of the circumstances the evidence was insufficient to sustain a conviction on counts of embezzlement, obtaining money by false pretenses, and malfeasance."

---

3. *Scripta manent, verba volent:* Written words remain, while spoken words fly away.

Appellant's final contention is that the evidence was insufficient to support his convictions of obtaining forty-five dollars from the Frederick County Commissioners by false pretenses, of embezzling eighty-five dollars from the Commissioners, and of malfeasance in office by permitting a prisoner to leave the jail unescorted and unsupervised. As we indicated in our extensive discussion of appellant's conviction for malfeasance under III, IV and VI, we believe the evidence ample to sustain that conviction.

As to the convictions under the counts charging false pretenses and embezzlement, a review of the record reveals that there was sufficient evidence or rational inferences from which a jury could be (and apparently was) convinced beyond a reasonable doubt of appellant's guilt.

Ralph Dwight Brown, owner and operator of the Trading Post located in Jefferson, Maryland, testified that on June 19, 1972, appellant made application to buy a pistol costing $78.95. Baumgartner had previously purchased 29 boxes of .38 caliber wad cutters (ammunition) at $3.00 per box, for a total of $87.00. Both the wad cutters and the pistol were charged to the sheriff's personal account. This account remained open for some time and Brown indicated that he talked to the sheriff several times about the $165.95 owed. On August 31, 1972, Sheriff Baumgartner instructed Brown to transfer the bill for the gun from his personal account to the County's account. Appellant gave Brown a check for $120.95 and instructed him to bill the County Treasurer for $45.00 so that the County account and the sheriff's personal account would both be paid in full. The witness indicated that he received the $45.00 from the County Treasurer.

Subsequent to the transfer of the bill for the pistol from Baumgartner's personal account to the County account, appellant sold the gun for $85.00 to Lewis E. Buckholtz, a Captain in the United States Army who was working part-time for the Frederick County Sheriff's Office. Buckholtz indicated that he paid for the weapon in cash in three payments. He thought that the gun was the personal property of the sheriff.

According to Baumgartner, these funds were deposited in

the "Frederick County Sheriff's Association" account. They were not returned to the County Treasurer. Several witnesses who were either current or former deputy sheriffs indicated that Baumgartner sold them boxes of wad cutters for target practice at $3.00 per box. While the County Treasurer paid for the wad cutters, Sheriff Baumgartner indicated that the money that he collected from his deputies was put into the "Frederick County Sheriff's Association" account. This "Association", created by Sheriff Baumgartner, was an informal group of his deputy sheriffs which appeared to have no official connection with County government.

There was ample evidence from which the jury could have found appellant guilty of obtaining $45.00 by false pretenses and of embezzling $85.00 from the County Treasurer. The requisite intent to defraud which appellant suggests is missing was amply demonstrated by his manipulation of the accounts at the Trading Post.

The crime of false pretenses is committed when a chattel, money, or valuable security is obtained from another by making a false representation of past or existing fact with intent to defraud and with knowledge of its falsity. *Bosley v. State*, 14 Md. App. 83, 89; *Polisher v. State*, 11 Md. App. 555, 560. The evidence was sufficient to support appellant's conviction under Art. 27, § 140.

"Embezzlement is a statutory offense designed to penalize those fraudulent conversions of money and other personal property which could not be prosecuted in common law as larceny because there was no trespassory taking." *Gordon v. State*, 5 Md. App. 291, 303. Appellant was convicted under Md. Code, Art. 27, § 138, "Embezzlement by Public Officers." The failure of Sheriff Baumgartner to account for the proceeds from the sale of the pistol after the bill for the weapon had been transferred to the County's account constituted the crime of embezzlement. Cf. *League v. State*, 1 Md. App. 681.

> *Judgments affirmed.*
> *Costs to be paid by appellant.*